ON ball, J.
delivered the opinion of the Court.
This prisoner, with Thomas M. Brown, was indicted in six counts, the first that they did inveigle, steal and carry away a slave named Isaac, the property of John Truesdale: 2d. That they did hire, aid and counsel one James Brown, son of Wilson, to inveigle, steal and carry away the same slave: 3d. That they the said James Brown and Thomas M. Brown did aid the said slave in running away and depart- *514 ¡ng from his master’s service. 4th, 5th, and 6th, are repeti-tp,ns 0f tsame counts, except that they charge the felonies as coauI^tte^ with the three slaves, Isaac, Hagar, and Verg. The objections, in arrest of judgment, are altogether the re-suit of a strained construction. The word “said,” which the prisoner’s counsel supposes may be applied to James Brown, son of Wilson, (more usually called big mouth James Brown,) instead of the prisoner, is a plain misreading of the counts. The word, according to every known rule of construction, applies to the prisoner, who upon his arraignment pleaded to the indictment by the name with which he was charged. There is therefore no such uncertainty in the indictment, as would arrest the judgment. But if there were any uncertainty in the five last counts, there is none whatever in the first, and upon that judgment must be given against the prisoner. For it is in vaiti to urge where there is one good count, that there are other bad ones : if the proof applies to the good count, judgment will be given accordingly. This matter was considered and discussed in the State v. Crank, and to the reasoning there 1 have nothing now to add.
2 Bail. 72.
2 Spears, 418
The motion for new trial presents, first, the ground that the prisoner had the right to have the names of the supernumerary jurors (who had been drawn and arranged on Monday,) redrawn, and presented successively, as drawn, to the prisoner for his challenge. Before I consider this or any of the other grounds, it is proper that I should remark, that I never saw the grounds of appeal, until read in this Court. The prisoner’s counsel told me he would appeal, but furnished no grounds: the brief interval between the close ofa seven weeks Circuit of incessant labor, and the meeting of the Court of Appeals, was the only opportunity I had to make out my reports. Rather than delay this, and other cases of the same attorney, I made out the reports iu which he was concerned, and forwarded them to him : and to this report, he has added such grounds as he chose, and of course they are not noticed by the report. This course is altogether wrong: and hereafter if notice, in writing, of appeal be not furnished, according to the rule of Court, the appeal will not be noticed, and parties must bear the consequences.
It may be, and very possibly the prisoner’s counsel did, on the Clerk beginning to call the supernumerary jurors, suggest that they ought to be drawn over; and that he was told, that case of the State v. Kleinback settled the practice, and that the Clerk was pursuing the proper course. But it made so little impression on my mind, that I had entirely forgotten it, aud were it not that the counsel asserts it to be so, I could not say that any thing of the kind took place. If it- had been seriously pressed, and I had thought it could have benefitted, and not injured the prisoner, I think it very likely, ex specials gratia, I might have indulged the whim!
1 Bail. 330.
2 Bail. 32.
But assuming every thing the prisoner’s counsel desires, I think the course pursued was right. It has, from my first recollection of criminal practice, been the practice to present to the prisoner the jurors for challenge, beginning with the foreman of jury No. 1, and running through the petit and plea jurors No. 1 and 2, impannelled and sworn, and then to present, successively, the supernumeraries, as drawn on Monday. The first questioning of this course began, on the part of a very experienced and zealous counsel, A. W. Thomson, Esqr., in the case of the State v. Resolved Slack. Judge Colcock, in that case, speaking of presenting the jurors, in the order in which they were impannelled, to the prisoner for challenge, very justly and pertinently observes: — “ But there can be no well founded objection to calling over the jury in the manner in Which the Clerk proceeded in this case; and if there were, no injury could result to the prisoner, for he is not thereby precluded from, his right of challenge, nor even restrained in its exercise. If he proceeds {in his challenges) in the manner in which the law directs him to proceed, it is wholly immaterial how the panel is called. On his arraignment, if he thinks it necessary to his defence, he may demand a copy of the indictment, a list of the panel, and three days to prepare; so that he has a full opportunity of selecting his jury."
This I think a just view of the law, and no objection of the kind I am now considering ever ought to be regarded as a debateable ground for a new trial. For, as is said, it is perfectly immaterial how the jury may be called; twenty peremptory challenges will give the prisoner the jury of his choice. In this case, the prisoner selected his jury before the panel was exhausted; so that no juror was forced upon him, against his will.
The objection started in the State v. Slack was considered in the State v. Sims, and authoritatively decided that the jurors impannelled as juries No. 1 and 2 were to be first presented to the prisoner. Speaking of exhausting jury No. 2, and still that the jury is not completed, Judge Johnson, who delivered the opinion, said — “If that is exhausted, then the names of the supernumerary jurors are to be drawn from the box or glass, until the jury for the trial of the prisoner is completed.” It will be observed that the ground of appeal did not question the manner in which the supernumeraries were presented, it spoke merely of juries No. 1 and 2 being presented, instead of the jurors being called as their names stood on the venire. Therefore the remark of the judge was a mere obiter dictum, on a matter to which his mind had not been particularly turned. I have no doubt the supernumerary jurors in that case were called as drawn on Monday; for such has been the invariable practice of the Clerk of Newberry. *516 There is no legal provision requiring that the jurors shall (jrawn eo instanti; they may be needed to supply the place of those challenged. They are as much drawn out of the box or gjass t0 supply those challenged, when they are drawn on Monday, and according to such arrangement presented to the prisoner, as if then drawn. The law is substantially complied with, and in a way much better calculated to benefit the prisoner than if he then had to depend on chance for the person who shall be presented to him. For he has the names of all his jurors before him, in the order in which they will be called: and he has it in his power to select his jury not only by his own judgment, but aided by the advice of his counsel and friends. It is, however, sufficient for this case, to say, that the course pursued here, had the sanction of the Court of Appeals, in the State v. Klienback. Speaking of it, Judge Butler said, “ It is one, however, which has its advantages, and is unexceptionable in practice.”

HSpears, 433.

2 Spears,'714, 716,717, ” ‘
2 Bail. 72.
On the 2d and 3d grounds it is unnecessary to say more, than that the evidence, if believed, made out the charges against the prisoner, under every count in the indictment.
The 4th ground assumes a very novel and staitling proposition, that to carry off a slave from his master’s possession furtively, with the intent to give him'his liberty,is not larceny. It is not necessary now to discuss whether such an act would not be larceny at common law. Though I may be permitted to say, there is no doubt it would. For the secret, fraudulent, deprivation of the owner of his goods, shews the felonious intent, as well without as with the causa lucri. But under the Act of 1754 there can be no doubt: for it declares the felony to consist in the inveigling, stealing, and carrying away a slave, so that the owner or employer shall be deprived of the use and benefit of the slave. The facts of inveigling, persuading a slave to leave his owner, and then carrying off the slave, so that his owner is deprived of his service, make one offence, and constitute stealing a slave, under the Act. The State v. McCoy.
Upon the 5th ground, it is only necessary to remark, that if true, as stated, it would be no objection. For then the verdict would be applied to the counts sustained by the proof. The State v. Crank. In this case there are three offences, of kindred character, charged; one for stealing, — another for hiring a third person to steal, — and the other for aiding the slaves to run away. The judgment is the same upon these offences, and though separate, in some degree, in description, they are so blended in fact, that the same proof applies to them all. There can be therefore no objection to their union.
As to the 6th ground, it may be remarked, no such instruction was given. It may, and very probably will, present an undecided question, in this State, if a jury, after being told *517 they ought not to convict a prisoner, on the uncorroborated evideuce of an accomplice, should yet do so, whether theirv verdict must not be supported. Rex v. Hastings & Graves.
32 Eng. C. L. Rep. 475.
12 Eng. C. L. Rep. 507.
The 7th ground presents the question, whether the witness, James Brown, (big mouth) was not corroborated. If he was, then there can be- no doubt that the prisoner is guilty. The Judge below said not to the jury, that the witness was fully1 corroborated; it is true, that was his deliberate conviction, still he was not bound to say so to the jury, and he withheld, as far as possible, his conclusions on the facts from the jury. One of the prisoners owed his life to the Judge, who suggested to the jury the possibility of innocence; and the only chance which the other had, was in so arraying the facts, as to make an apparent question of guilt or innocence, when indeed there was none. If this case be compared with Ford’s case,* who was convicted and executed for this same offence, on the testimony of an accomplice, it will be seen that the corroboration there was less, by far, than in this.
It may be, as said in Rex v. Wilkes, that a corroboration of an accomplice’s testimony should connect the prisoner with the felony. Yet Alderson, B. in that case, said to the jury, “You may legally convict on the testimony of an accomplice only, if you can safely rely on his testimony but he said, “ J advise juries never to act on the evidence of an accomplice, unless he is confirmed as to the particular person *518 charged.” This was the main case relied upon by the pri- , soner’s counsel, and, certainly, instead of proving any thing in his favor, is decidedly against him. For the Judge admitted that the jury might convict, on the testimony oí the accomplice alone. He advised, as was done here, not to convict on that alone. If, however, the jury had, notwithstanding, convicted on no other proof, according to the case the conviction would have been good. In that case the Judge said that the fact that the sheep-skin was found in the whirly hole, where the accomplice said it was thrown, did not connect the prisoner with the felony, sheep-stealing, — it was, however, after-wards shewn that meat of a corresponding kind was found in the prisoner Edward’s house, and that Wilkes, the other prisoner, had borrowed a pair of shears, and made a statement of the same effect as that made by the accomplice, and the jury convicted both prisoners. In the case under consideration, there can be no doubt, after reading the report, that the prisoner was fully connected by the corroborating proof, with the felony : indeed, as the solicitor argued, he might have been convicted without even calling James Brown the witness. But this doctrine of corroboration requires a little further examination. In 1 Russ. and Ry. I find Birkett and Bradley's case, in which it is said ihat the twelve Judges in England, in 1813, gave it as their opinion, that an accomplice did not require confirmation, as to the person he chaiged, if *519 be were confirmed as to the particulars of his story. This is, I think, the true notion. For the confirmation.or corroboration, is to satisfy the jury of the truth of the accomplice.— This is as well done by shewing the truth of the particulars of his story, as it is by connecting the prisoner with the felony. But when this matter is further pursued, it will be seen in Rex v. Hastings and Graves, Lord Denman said “it altogether for the jury, and they may, if they please, act upon the evidence of the accomplice without any confirmation of his statement.” But he adds, “ one would not, of course, be inclined to give any great degree of credit toa person so situated.” The previous part of his lemarks constituted a rule: the latter was merely advice. In The King v. Shuham, all of the Irish Judges (except O’Grady, C. B. who was absent,) held that, “ in jjoint of law. the testimony of art accomplice, although uncorroborated, was evidence to be submitted to a jury, and that a conviction upon it would be legal.”
Crown cases, 251.
C. L. ReP-
Crown cases,byJebb.
After this review there can be no room to question the prisoner’s conviction. Indeed, I am much inclined to concur in *520 the ruling nf the Irish Judges, in Shuham’s case; and to hold that all that ought to be said about the necessity of con-Urination or corroboration, is matter of advice to the jury, to prevent them from rashly confiding in an accomplice.
The other two grounds require no observation. I must, however, be allowed to say, in reference to the 8th ground, that I not only made no such charge in this case, but that in nearly twenty-one years, that I have now had the honor of presiding in the Courts of the State, I never made such a charge in any capital case. I feel too much for any poor trembling wretch, standing on the narrow isthmus between time and eternity, to cut off from him even the chance of escape, which he has in a jury properly instructed. When I think the prisoner ought not to be convicted, then I never hesitate to put my foot on the scale, so as to make it preponderate in his favor. But never has my opinion of the guilt of a prisoner, charged with a capital felony, been expressed to a jury.
The motions in arrest of judgment, and for new trial, are dismissed.
Evans, J. — Wardlaw, J. — and Frost, J. — -concurred.

 The State v. William Ford.
One charged as an accomplice was proved to have been concerned in the commission of the telony. After this proof, in con oboration of his testimony as an accomplice, it was held, competent to prove any act or declaration of his which went to show that he and his associate did commit the felony.
Proof of declarations which show the inception in the mind of the prisoner of a scheme of villainy, which is afterwards developed by an act done, and for which he is on trial, is competent. Remoteness of the time when such declarations were made, cannot, in such case, render them incompetent.
According to a well settled rule in criminal cases, if a prisoner’s guilt be clearly made out by propir evidence, in such a way as to leave no doubt in the mind of a reasonable man, his conviction ought not to be set aside because some other evidence was received which ought not to have been. 2 Russ, on Crimes, 5.'>0.
It is in a case of doubtful facts, or to rebut the legal presumption of guilt, arising from the possession of stolen articles, that a good character proved in court is of most effect.
Before O’Neall, J. at Spartanburgh, Spring Term, 1839.
The prisoner was indicted, with one Jesse Hindman, for stealing two slaves, Jenny and Douglass, the property of Philip Pilgrim. *518 The prisoners chose to sever for trial, and the State elected to try Ford first. His guilt was fully proved by one of their associates, Reynolds Dill; in corroboration of his testimony, a train of circumstances was relied upon. The witness, Dill, lived in Greenville, twenty miles from the prisoner; he was seen at the prisoner’s house on the evening of the night in which the negroes were stolen ¡ a letter, which he said was written to him by Ford, was produced, in which the prisoner invites Dill to come to his house to make the “roll for him,” &c. It was proved by Mr McMullen that he was with the witness. Dill, in Greenville district, sawing shingle blocks, when James Ford, a brother of the prisoner, delivered a letter to Dill, which he, Dill, swore was the letter produced. Several witnesses said they did not think the letter was in Ford’s hand writing, though there was some resemblance to it It was compared with another letter, admitted by Dill to be written by himself, and there was certainly a great similarity between them. Dill proved that while he and Ford were conferring about the negroes, Ford told him he was indebted to Josiah Kilgore in a sum of three thousand dollars — the times were hard — that he was going right into speculation, and he would make the money that winter. The debt to Kil-gore was proved to have been as Dill stated. When Dill was arrested, a fifty dollar counterfeit bank note was found in his possession, which he said he got from the prisoner, Ford, at the time the negroes were stolen. This bill was fully proved to have been in the possession of Hindman. On the day and night when the *519 negroes were stolen, the prisoner, Ford, was seen on the road from bis house towards Hindman’s, who lived near to Pilgrim’s plantation, where the negroes stolen were employed. Ford lived about eight miles distant. In the day he was seen within about five and a half miles; in the night, he was seen within one mile. It was proved that, on the same day, Hindman was seen on the road from home towards Ford’s When met by Allen, he inquired about his brother, who was moving, and said he must see him. Ford and Hindman occupied the same cell in gaol. Dill was in a different one — he proved a conversation in gaol with the prisoner, Ford, in which he proposed to Dill to ask the Grand Jury, when he should go before them, to send Mr. Pilgrim out of the room, and then that he should swear that, Pilgrim being in debt to the amount of fifteen hundred dollars, employed him to carry off the negroes, and to sell them, and bring him the money, and let him know where the negroes were, so that he could reclaim them. He told him to say that the bargain was made on Monday evening of last court, at a wagoner’s camp, on the right hand of the road leading from Spartauburgh. He described to Dill, Pilgrim’s person and dress, and wagon, and told him, after he had made this statement to the Grand Jury, to have Pilgrim called in, and to ask him about these facts — and he said he could not deny them ; if he did he said he had witnesses who could prove he was at the wagoner’s camp at the time pointed out. Dill said he never saw Pilgrim until he saw him a few weeks before court, when he, Pilgrim, called to see him in gaol. Mr. Pilgrim proved that he had never seen Dill until the time he had mentioned in the gaol. He said, on Monday evening of last court, on his way from Spartanburgh, he did stop at a wagoner’s camp on . the right of the road. Hindman admitted that he, Hindman, was there at the time when he, Pilgrim, stopped. This conversa *520 tion in gaol was overheard by Julius Byers, who was confined for an assault and battery, and was in the same cell with Dill, and at his instance listened to what Ford said. He detailed, in substance, the conversation proved by Dill To the facts connecting Hind-man with the prisoner, Ford, and to this admission, that he was at the wagoner’s camp when Pilgrim stopped, the prisoner’s counsel objected. The Circuit Judge thought them admissible.
The prisoners were together charged with a felony; many of the circumstances on which their guilt depended, must be gathered from the act; of each. Dill proved the manner in winch the negroes were carried off — his mode and manner of travelling. In these respects he was corroborated by J. W. Hay and John Cole, who saw him on his way. He also stated that his wagon broke down, and he turned the negroes into the woods — he and they returned to Ford’s. He described a house in which they were kept; out of that house, on the Sunday week after they were stolen, the negroes were run. He said that the prisoner furnished the negroes with throe dollars to buy shoes for their trip; they each bought, on the night and the day preceding the night they were stolen, a pair of shoes, for which they severally paid one dollar and fifty cents.
In the course of the case, the Solicitor proposed to ask David Anderson, if, at any time, the prisoner had proposed to him to embark in a scheme of villainy like the present. This question was objected to. His Honor thought it competent to shew the existence of the corrupt intention on the part of the prisoner, at a time previous to the commission of this felony, and which was consummated by it. The witness said that the prisoner, two years ago, was drinking, and made some impertinent observations to him; he commended his, (witness’) smartness, and told him if he would come *521 over and join the lodge at his house, be would make a smart man of bim. To James Anderson, tbe prisoner said there was an easier way of making money than by work.
In tbe course of tbe defence, tbe prisoner relied upon tbe fact, that Dill told West, another prisoner in gaol, that be did not know Hindman, be bad never seen him that be knew of. In bis examination, Dill said be saw Hindman at Ford’s on Sunday night when the negroes were stolen — and again at tbe same place on Wednesday night, when be, Dill, started off with tbe negroes. Dill’s character was attacked by tbe prisoner — but ten out of fourteen witnesses swore that they would believe bim. There were several letters produced in evidence, three of which Dill swore were written by Ford, as he believed — he said be received two of them in gaol at Greenville, from a man who would not tell bis name. Tbe gaoler, Norton, said one of them was found ten or twelve miles above Greenville, and was brought to bim at bis request. Tbe other, be said, was found sticking in a bush in tbe gaol yard, and was pointed out to bis little boy by tbe prisoner. Tbe prisoner alleged they were all in Dill’s writing, and there was a great similarity between them and that acknowledged by Dill. Dill bad said in bis examination, that be was a stranger in Pilgrim’s neighborhood — that be bad once been down tbe road by Ford’s and Dr. Woodruff’s, to tbe Factory.
John B. Scott, who lives on tbe road described by Dill, and in four and a half miles of Pilgrim’s, proved that Dill bad been at bis bouse and stayed all night, tbe Summer or Fall before this felony. He said be was a Patent right School master — he was going to Cross Anchor — thence to Augusta. They talked about' Stewart’s book giving an account of Murrell’s villainy. Dill ex *522 plained some matters in it wbicli he never had before understood.
Di.l, in his examination, stated that the prisoner, Ford, furnished him with the carryall in which he carried off the negroes. The prisoner was allowed to prove that a man of the name of Roberts, who had run away for hog stealing, said that ihe witness, Rill, got the wagon from him ; but he also said, Ford was to see the hire paid. In the gaol, Ford told West that Dill got the wagon from Roberts to go to the Juggery.
His Honor submitted the case fully to the jury, and explained to them, carefully, the rules by which they ought to be governed. In commenting upon and illustrating the rules by which criminal cases are governed, he said to them, that in two cases, proof of good character would make the scale preponderate in favor of a prisoner.
1st. Where his guilt depended upon the legal presumption arising from being found in the possession of a stolen article.
2d. In a ease of doubt; where, however, there was not proof of good character, then the case was governed by the rule that the State was bound to prove the prisoner’s guilt before he could be convicted.
The jury found the prisoner “guilty.”
He appealed, on the annexed grounds.'
1. That the evidence of what Hindman said or did ought not to have been received.
2. That tiie evidence of the conversation with James Anderson, four years previous, and David Anderson, two years previous to the trial, ought not to have been reci ived.
3 That his Honor was wrong in charging the jury that evidence of good character, to obtain consideration, ought to be proved— *523 that legal good character was insufficient — and that though he would charge them the evidence was insufficient to convict a man of good character, it was sufficient to convict one of a legal good character only.
4. That the verdict was contrary to law and the evidence.
Henry Sf Bobo, for motion.
Whittier, Sol. contra.
O’Neall, J. delivered the opinion of the Court.
The grounds taken for a new trial will he considered in the order set down in the notice.
1st. That Hindman’s declarations and acts were competent evidence, has been conceded in the argument here; still, as the ground was not abandoned, it is necessary it should be decided by the Court
The prisoners, Ford and Hindman, were not only charged with the commission of a felony, but they had been proved, by Hill, to have been together concerned in it. After this proof, in corroboration of his testimony as an accomplice, it was competent to prove any act or declaration of Hindman, which went to shew, that true it was. he and Ford did commit the felony. The case of The King v. Stone is an authority upon this point; and in the argument of that case, it was said, and not denied, that the rule was settled at the Old Bailey, “ that where several were concerned in the same design,” the acts of one were received against another, though he were not present. The declarations of an associate, admitting a particular fact concerning himself in the same transaction, must, on the same principle, be evidence.
2d. The question propounded by the Solicitor to the Ander- *524 sons, was couched in as general terms as possible, in order to avoid the objection to it as a leading one. It was intended, as I understood at the time, to elicit an answer as to some solicitation to steal negroes. The respectability of the witnesses prevented any one from supposing that they had listened to it, or that the prisoner would have dared to openly unveil his purposes. Their answers, therefore, however equivocal as to the import of the prisoner’s intention, were obliged to be received, and it was for the jury to say whether they furnished any evidence of a corrupt intention, on the part of the prisoner, which was consummated by this felony. And in that point of view alone, were the prisoner’s conversations with the Andersons permitted to go to the jury. If they furnished no such evidence, then the jury were told that they could have no effect on the prisoner’s guilt. Looking to the testimony thus explained, I cannot perceive any objection to its competency. It was not undertaking to prove the guilt of the prisoner, by shewing that he had previously committed another felony of the same kind; nor is it proof that the prisoner has a general disposition to commit the same kind of offence. Both these kinds of proof would be inadmissible. But I have yet to learn that proof which shews the inception in the mind of the prisoner of a scheme of villainy, which is afterwards developed by an act done, and for which he is on trial, is not competent.
*523 6 T. R. 527.
Arch. C. P. 109.
*524 Bemoteness of time, where the party made declarations pointing to this corrupt intention, cannot render the evidence incompetent.For years may roll over a felon’s head while he is arranging his schemes, or while the guilty thought conceived in his mind is ripening into the deliberate purpose with which a crime is committed. *525 A great lapse of time may shew that the probability is, that it could not be connected with the crime; this would, however, be always a consideration for the jury, in giving effect to the testimony. Independent, however, of this satisfactory view, it seems to me, and here I only speak for myself, that the competency of the testimony might be sustained in another point of view. The guilt - of the prisoner was fully proved by his accomplice, Dill, who said that it was at his, the prisoner’s, solicitation that he embarked in the felony. To corroborate him, was the main object of much of the testimony in the cause. If it could be shewn that he had thrown out dark hints to others, who had declined, might it not be considered, as the natural consequence, that his solicitations would be followed up until he found his man 1 In this respect, I think the testimony offered and received, was much more free from objection than that received in Rex v. Hunt & others. In that case, the prisoners were indicted for conspiring and unlawfully meeting for the purpose of exciting discontent among his Majesty’s subjects at Manchester. It was held competent to shew against Hunt, that at a similar meeting in another place, holden for a similar purpose, he had proposed certain resolutions. That was allowed as evidence of his sentiments and views, to shew coincidence with the meeting in which he presided as chairman. The same idea applies to the proof in this cause; it was to shew that the guilty thought of procuring another to steal for him, began several years ago, and was carried into effect in his employment of Dill. Any proof which does not shew another distinct felony — or which does not rest upon the prisoner’s general tendency to commit such a crime, and which yet furnishes a circumstance of guilt, is always competent evidence to establish a crime. In The King v. Ellis, Holroyd, J. said “upon an indictment for robbing the prosecutor of a coat, the robbery *526 having been committed by the prisoner’s threatening to charge the prosecutor with an unnatural crime, I received evidence of a second ineffectual attempt, to obtain a 1£ note from the prisoner by similar threats, but reserved the point for the consideration of the Judges, and they were of opinion that the evidence was admissible to shew that the prisoner was guilty of the former transaction.” This, it seems to me, is full to the point in this case; if a subsequent similar ineffectual attempt is evidence of guilt, why is not a prior ineffectual attempt also evidence of guilt? No reason for a difference in the effect of such proof presents itself to my mind, and hence I conclude that the last, as well as the former, is admissible.
*525 3 B. & A. 566.
13 £ng- c. L. R, 125."
*526 It was supposed in the argument, that this proof was an indirect assault upon the prisoner’s character. But it is not so. It is a circumstance, it is true, against him. if the jury took the view of the testimony in which it was received. It was, then, like any other fact in the case tending to prove the prisoner’s guilt; so far as it proved it, so far it detracted from our belief of his honesty. Still each circumstance must be heard, for they make up the aggregate of guilt or innocence.
If the jury did not believe that the prisoner’s declarations to the AnderSons furnished evidence of a corrupt intention, which was consummated by this felony, then the proof by them was wholly irrelevant to, and could have had no effect whatever on, the case; and, in this point of view, the prisoner cannot have a new trial.
According, however, to a well settled rule in criminal cases, if the prisoner's guilt were clearly made out by proper evidence, in such a way as to leave no doubt in the mind of a reasonable man, his “ conviction ought not to be set aside because some other evidence was received which ought not to have been.” This rule is, I *527 know, to be tenderly and cautiously applied; and I would be the last man on earth to apply it where there was room to doubt. But when 1 know that the- prisoner’s guilt is as plainly made out by the other evidence, as it is possible to be done, 1 should feel that I was literally straining at a gnat, while, in fact, I was swallowing a camel, if I hesitated in applying it to this case. When even the prisoner’s counsel confess their convictions of his guilt upon the other proof, how can there be any danger of erring in refusing a new trial under the rule just stated? If this were a civil case, none would doubt the propriety of refusing the motion; and yet the rules applicable to civil and criminal cases are precisely the same.
*526 2 Russ, on Crimes, 530.
*527 3d. This ground is explained in the report; but if it had been, that the charge had been in the words stated in the ground, what error is to be found in it ? In a criminal ease, character, to receive consideration, must be proved. Indeed, such proof is the prisoner’s privilege, “he will be allowed,” says the authority, “to call witnesses to speak, generally, as to his character.” If he does not avail himself of this privilege, how can he claim any other benefit from the legal presumption, that he is of good character, save that which is afforded to every criminal, that he shall be held to be innocent until his guilt be established to the satisfaction of the Court and jury ? It is in cases of doubtful facts, or to rebut the legal presumption of guilt arising from the possession of stolen articles, that good character, proved in Court, is of most effect. The same reason applies to both. In each, there is a possibility of innocence; and proof of good character adds so much more to that possibility, that a conviction would be wrong; but without that proof the prisoner has no advantage from character Archbold, in his Criminal Pleading, states the rule much less favorably for the prisoner than was done on his trial. He says — “ evidence of the defendant’s character can be of avail only in doubtful cases; where the probabilities of the defendant’s guilt on the one side, and the probabilities of his innocence on the other, are nearly equal, satisfactory testimony, as to his general good character for honesty or humanity, may have the effect of raising a well founded presumption in the minds of the jurors, that a man of such character could not have been the *528 perpetrator of the larceny or murder imputed to Mm; and in .tMs sense, it may be deemed evidence tending to the disproof of the matter in issue.”
*527 Arch. C. P. 111.
p. 112.
*528 4th. This general ground needs no comment, further than to say, that the law of the case has been already vindicated, and, that as to the facts, they most plainly shew the prisoner’s guilt. The motion for a new trial is dismissed.

Motion refused.

Evans J. — and Butler, J. — concurred.
Earle, J. — I am against the motion for a new trial. The only ground which is seriously urged, is the admission of the prisoner’s declaration to James Anderson, and his conversation with David Anderson. In deciding on their admissibility, it is necessary to recur to the object of the enquiry, and to the shape in which the question was propounded. It was supposed that the prisoner had made direct overtures to the Andersons, shortly before the felony charged, to engage with him in stealing negroes; and the general question was put — did the prisoner at any time make such a proposition ? If the answer had been that he did, and about the time or shortly before, it would have been admissible, for the reasons assigned by Mr. Justice O’Neall, and on the authority of the King v. Ellis. But the answer was not such as was expected, and was given before it could be checked, even if it had been incompetent. The answer referred to a period too remote, and was too equivocal and unintelligible to have any bearing on the issue or any influence on the jury. It was not urged in argument by the State’s counsel, and seems to have been considered either unmeaning or wholly irrelevant. The Andersons, in my judgment, proved no distinct substantive fact having any bearing on the prisoner’s guilt, nor any fact calculated to support the credit of Dill, the State’s witness. In such a case as this, where the prisoner’s guilt is very manifest, and is not only proved by the accomplice, but where his testimony is strongly corroborated by many other circumstances proved by different witnesses, I think it would exhibit unnecessary squeamishness, to say he has not been legally convicted on abundant evidence.