IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 5, 2023 Session

**STATE OF TENNESSEE v. TONY THOMAS and LARONDA TURNER**

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. C17-00608, 17-00382  J. Robert Carter, Jr., Judge**

_____

**No. W2019-01202-SC-R11-CD**
_____

A jury convicted two defendants, Tony Thomas and Laronda Turner, of three counts of first-degree premeditated murder. Those convictions stem from a triple homicide that occurred in Memphis, Tennessee, in 2015. Another co-defendant, Demarco Hawkins, was also implicated in the killings. However, his trial was severed from the other defendants, and he testified against Mr. Thomas and Ms. Turner. After Mr. Thomas and Ms. Turner were convicted, they appealed to the Court of Criminal Appeals, raising five issues for review. The intermediate appellate court ruled unanimously on three of the issues, but one judge dissented on the other two. Mr. Thomas and Ms. Turner sought permission to appeal, and we accepted the appeal only as to the two issues on which the intermediate appellate court was divided. First, we agreed to consider whether the prosecution breached the requirements of Brady v. Maryland, 373 U.S. 83 (1963), by failing to produce statements made by Mr. Hawkins at proffer conferences, which were allegedly inconsistent with Mr. Hawkins' formal statement to law enforcement, before trial. Second, we agreed to address whether the evidence was sufficient to support Ms. Turner's murder convictions. Based on our review, we conclude that the State did not breach its obligations under Brady with regard to Mr. Thomas. Additionally, we determine that the evidence is insufficient to sustain Ms. Turner's convictions because Mr. Hawkins' testimony was not adequately corroborated.[1] As a result, we affirm the decision of the Court of Criminal Appeals in part and reverse in part. Additionally, in this opinion, we abrogate Tennessee's common law accomplice-corroboration rule. However, we apply that change on a prospective basis only, and, thus, it has no bearing on the outcome of this case.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part**

---

[1] Because of our holding that the evidence is insufficient to sustain Ms. Turner's convictions, we need not reach her arguments on the Brady issue.

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., and ROGER A. PAGE, J., joined. SHARON G. LEE, J., filed a separate opinion concurring in part and dissenting in part. SARAH K. CAMPBELL, J., filed a separate opinion concurring in part and dissenting in part.

Harry E. Sayle III, Memphis, Tennessee, for the appellant, Tony Thomas.

Josie S. Holland, Memphis, Tennessee, for the appellant, Laronda Turner.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; T. Austin Watkins, Senior Assistant Attorney General; Andrew C. Coulam, Senior Assistant Attorney General; and Samantha L. Simpson, Assistant Attorney General, for the appellee, State of Tennessee.

Jessica M. Van Dyke, Nashville, Tennessee, for the Amicus Curiae, The Tennessee Innocence Project.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND[2]**

This case arises from a triple homicide that took place at a duplex on 1503 Lake Grove Street (the "Duplex") in Memphis, Tennessee, during the early morning hours of September 26, 2015. Eventually, three co-defendants were indicted by a grand jury, with two of the co-defendants, Tony Thomas ("Mr. Thomas") and Laronda Turner ("Ms. Turner"), proceeding in a joint trial in 2019. The other co-defendant, Demarco Hawkins ("Mr. Hawkins"), had his case severed from that of Mr. Thomas and Ms. Turner and testified at their trial as part of the State's proof. In this appeal, we address the case of Mr. Thomas and Ms. Turner (collectively, the "Defendants").

Terry Jennings ("Mr. Jennings") called 9-1-1 at 1:31 a.m. on September 26, 2015. Mr. Jennings, who lived next to the Duplex, had been sitting on his couch when he overheard a hostile conversation next door. Mr. Jennings heard one man utter the words "[d]on't shoot me," to which another responded "[y]ou done messed up." A series of gunshots ensued. Mr. Jennings looked out his window and saw two men walking away from the Duplex. The two men walked to a maroon-colored car parked on the opposite side of the street. Once the car drove away, Mr. Jennings placed the 9-1-1 call. Mr.

---

[2] We will address the facts and procedural background necessary to resolve the issues in this appeal. For a full recitation of the facts and procedural history, see the Court of Criminal Appeals' opinion in this case. State v. Thomas, No. W2019-01202-CCA-R3-CD, 2021 WL 5015255 (Tenn. Crim. App. Oct. 28, 2021), perm. app. granted, (Tenn. Apr. 14, 2022).

Jennings recognized one person leaving the Duplex as someone he had seen at that residence previously.[3]

Sergeant Brad Webb ("Sergeant Webb") of the Memphis Police Department was the initial case coordinator on the crime scene. Sergeant Webb described the actions his unit took at the crime scene:

> We viewed the scene inside to see if there—what kind of evidence would be there. [We] [d]irected other members of the homicide office—we started doing a neighborhood canvas, which at that time of morning there wasn't a lot of people that we could talk to. [We] [h]ad Crime Scene come to the scene and did some review of the evidence there and asked them to collect certain items.

Sergeant Webb did not recall whether he had entered the Duplex with the other officers that morning.

Detective Nick Dandridge ("Detective Dandridge") replaced Sergeant Webb as case coordinator shortly after the investigation started. According to Detective Dandridge, officers entered the Duplex through a side door on the south side of the Duplex because a large body lying near the front door prevented them from using that entrance. Upon entering, the officers found Anthony Isom's ("Anthony")[4] body wedged between the side of a bed and the front door. Detective Dandridge testified that Anthony had been shot multiple times. Officers would go on to find two more deceased individuals in the Duplex. They found Chastity Springfield ("Ms. Springfield") with "one foot out the window . . . hanging lifeless[ly] with several gunshot wounds." Officers believed that Ms. Springfield had tried to escape the Duplex when she first heard shots by pushing an air conditioner out of the window so that she could exit the house. However, according to Detective Dandridge, she was "ambushed from the back" and "shot multiple times," killing her before she could escape. After discovering Ms. Springfield's body, officers found Michael Glover's ("Mr. Glover") body lying in a closet.

---

[3] In the 9-1-1 call, Mr. Jennings stated that he did not recognize either of the assailants. At trial, Mr. Jennings testified that that information was inaccurate.

[4] Both the Court of Criminal Appeals' opinion and the State's brief use first names of members of the Isom family because Anthony Isom shares the same last name with several key witnesses in this case. See Thomas, 2021 WL 5015255, at *1 n.3. We choose to do the same for purposes of clarity, and, like the State and the Court of Criminal Appeals, we intend no disrespect in doing so. See id.

Detective Dandridge further testified that, inside the Duplex, officers uncovered a "gang journal" and several firearms.[5]  A photograph taken inside the Duplex after the killings shows the words "RiP Ralph Sep[.] 2, 2015" written on an interior wall of the duplex.[6]  Another photograph shows a bill from Memphis Light, Gas and Water, addressed to a man named James Brannon, attached to a wall inside the Duplex with a thumb tack.[7]  Across the street from the Duplex, officers found a broken glass jar and some small baggies of marijuana near the street curb where the car had been parked.

Shortly after the killings occurred, Mr. Jennings went to the police station and discussed what he had witnessed with Detective Dandridge.  At that meeting officers took a formal, written statement from Mr. Jennings, although Mr. Jennings stated at trial that he only recognized "some of" the statement.  Nevertheless, Mr. Jennings confirmed that he recognized the signature on the last page of the statement and the initials at the bottom of each page as his own.  The statement described one assailant as a "light-skinned" man, standing about five-feet nine-inches tall and "slim," and described the other assailant as "real dark, [five-feet eight-inches tall], not fat but a little heavy, [with a] round face . . . no shirt on . . . he might have had dreads."[8]  The police report further indicated that Mr. Jennings described the two men as "around [age] 23, under [age] 30."[9]

At the police station, Mr. Jennings was shown two photograph lineups of males fitting Mr. Jennings' description of the assailants.[10]  One of the photographs included in the first lineup was of Mr. Thomas, whom Mr. Jennings did not identify when he was shown the pictures.  That photograph lineup, identified as spread "A," was later admitted into evidence at trial.  Detective Dandridge testified that another lineup admitted into evidence at trial, labeled as spread "B," was also shown to Mr. Jennings at the police

---

[5] In Sergeant Webb's trial testimony, he stated that he did not recall whether officers had recovered any handguns from the Duplex, but he did remember officers recovering ammunition cases.

[6] The name "Ralph" is presumed to be a reference to Ralph Martin, a former Vicelord who died in a drug deal gone wrong on September 2, 2015.

[7] Detective Dandridge testified at trial that, although James Brannon was initially considered an important person in the case, he was cleared of any wrongdoing by Sergeant Webb early in the investigation.  However, Sergeant Webb stated in his testimony that he did not recall James Brannon as the name of a suspect.

[8] In his trial testimony, Mr. Jennings described one person leaving the house as "about [six-feet] tall" and "light-skinned," and described the other as having "a lot of hair on his head," "dark-skinned," and under six feet tall.

[9] Mr. Jennings testified at trial that he did not recall providing an estimate of the ages of the men leaving the Duplex to the police.

[10] Because Mr. Jennings had told officers that he had not seen any women leaving the Duplex after the murders, he was not shown any lineups including photographs of women.

- 4 -

station.  Mr. Jennings testified that he did not identify either of the men leaving the Duplex in the photographic lineups, but claimed that he believed he had a clear enough view of the men that he would have been able to identify them had they been pictured in the lineups.  Although the two men were walking away from Mr. Jennings when he looked out his window, Mr. Jennings testified that he "could see the side of their faces" and was aided by "a light from the light pole" in front of his house.

Detective Dandridge testified that officers used surveillance footage near the Duplex to identify a maroon-colored car leaving Lake Grove Street around the time the 9-1-1 call was placed.  Officers later determined that Mr. Thomas and Ms. Turner were known to drive a large, maroon-colored car of an older model, closely matching the characteristics of the car seen in the surveillance footage and identified through a still shot of the footage.  Officers brought Mr. Thomas into the police station on September 28, 2015, to discuss the situation.  Mr. Thomas was shown the still shot image of the car and identified the car as belonging to himself and Ms. Turner, circling the vehicle and writing "[t]his is our car," on the image.  Ms. Turner also recognized the car in the still shot image, writing "[t]his is my car.  I have the same car," on the copy of the image presented to her.  Detective Dandridge testified that he did not tell Mr. Thomas or Ms. Turner what date and time the photo was taken before asking if they could identify the car.  Officers ultimately obtained a warrant and searched the car, a 1997 Mercury Grand Marquis.  Paperwork and latex gloves were the only items found by officers in the car upon the search.

Consistent with the "gang journal"[11] uncovered by police at Anthony's residence following the killings, trial testimony paints the picture that the Duplex was a hotbed for gang-related activities.  According to one of Anthony's younger brothers, Jeremiah Isom ("Jeremiah"), Anthony had been a member of the Vicelords and was referred to as "Big Fella," "Big Fine," and "Hoppo" by members of their sect of the gang.  Jeremiah testified that Mr. Glover, nicknamed "Killa," was also a member of the Vicelords who sometimes stayed the night at the Duplex.  Anthony ranked just below Mr. Thomas, also known as "Little Tony," and the gang's other leader, Ralph Martin ("Mr. Martin"), also known as "Big Ralph," who, according to Jeremiah, also had previously resided at the Duplex.[12]

Mr. Martin had been killed on September 2, 2015, mere weeks before Anthony, Ms. Springfield, and Mr. Glover died.  Jeremiah confirmed that he was at the scene of Mr.

---

[11] Anthony's brother and fellow former Vicelords gang member Jeremiah Isom testified that the notebook was also commonly referred to as an "account sheet" or an "account book" by gang members and was used to keep record of meetings conducted by the Vicelords.

[12] Mr. Hawkins, who was also a Vicelord and a friend of Mr. Martin's, characterized the gang's hierarchy differently.  He described Mr. Martin as being in charge of Mr. Thomas in the gang's hierarchy, and further described Mr. Thomas as being "underneath" Anthony.  Further conflicting testimony from Vicelord Courtney Hankins alleged that Mr. Thomas did not hold any rank or lead any gang-related meetings.

Martin's death and testified that some of his fellow gang members claimed, after the killing took place, that it had been his duty to provide security for Mr. Martin. Jeremiah testified that he was unaware that he had been designated to provide security for Mr. Martin and instead claimed that Mr. Martin had "just told me to get to the spot" on the day Mr. Martin was killed.

According to Jeremiah, the Vicelords abide by a policy requiring that a gang member who fails to provide adequate security for a high-ranking member be punished. Mr. Hawkins also testified as to this policy within the Vicelords, testifying that "[when] [s]omeone get[s] killed in the top rank, that's top rank. That mean[s] the next person [has] got to get it, basically." According to Mr. Hawkins, because of Anthony's rank within the Vicelords gang, it would have been his responsibility to ensure Mr. Martin did not go out without adequate security. Jeremiah testified that Mr. Thomas wanted to inflict a "five and out" punishment[13] towards Jeremiah as retribution for Mr. Martin's death. However, Jeremiah claimed that Anthony "stood up for" him in response to the suggested punishments. Jeremiah further testified that "[Anthony] and [Mr. Glover] [were] the only one[s] in my corner."

According to Jeremiah, by September 25, 2015, the day before Anthony, Ms. Springfield, and Mr. Glover were killed, he was no longer affiliated with the Vicelords. Although he had been expelled from the gang, Jeremiah testified that he visited the Duplex on September 25th around five o'clock in the afternoon to "kick it with my brother for a little minute." Roughly two hours after Jeremiah's arrival, Mr. Thomas arrived at the Duplex with Ms. Turner, another Vicelord. Jeremiah stated that, although "[e]verything was cool," he avoided Mr. Thomas because Mr. Thomas had sought to have him punished. Nevertheless, Jeremiah stayed around the Duplex in the company of several other people, including Ms. Springfield and Mr. Glover, until he left to grab some food for Anthony, which he later brought back to the Duplex. Around nine o'clock that night, Jeremiah left the Duplex again and did not return. Jeremiah did not witness any drama during his time at the Duplex that day. When asked whether anybody had a firearm at the Duplex that day, Jeremiah responded, "they [are] Vicelords. So, of course they [are] [going to] have guns," and testified that Anthony, Mr. Glover, and Mr. Thomas had all been armed at the gathering. Nevertheless, Jeremiah stated that he had no concerns for his brother's safety when he left the Duplex.

By contrast, Jerrico Isom ("Jerrico"), another one of Anthony's brothers, testified that he overheard a conversation at the Duplex that day that led him to believe Anthony may be in danger. Jerrico further testified that he overheard Mr. Thomas tell Courtney Hankins ("Mr. Hankins"), also known as "Little Solid," and one other unidentified man

---

[13] Jeremiah testified that a "five and out" punishment is Vicelord nomenclature for a punishment in which a gang member is beaten for five minutes and then banished from the gang.

that Anthony was "in the way."[14] Jerrico then warned Anthony about the conversation he had overheard, telling Anthony that he had overheard Mr. Thomas "talking about hurting [Anthony]." However, Jerrico further stated that, at the time, he did not believe Mr. Thomas' comments indicated that Anthony's life was at risk. According to Jerrico, Anthony appeared unconcerned about the conversation and any potential threats, telling Jerrico to "forget [those] guys, I'm not worried about them." Jerrico admitted that he did not reveal the details of what he overheard to the police in 2015, and also did not reveal said details to the prosecution until 2019.

However, according to testimony, Jeremiah and Jerrico were not the last of Anthony's family members to encounter Anthony and the other victims before their deaths. Rather, Anthony's father, Elesha Malone ("Mr. Malone"), testified that he was walking the streets late at night on September 25, 2015, "getting high" and had been using crack cocaine throughout the day when he stopped at the residence of "Larry," Anthony's next-door neighbor. Mr. Malone had sought to purchase additional drugs from Larry. Mr. Malone did not have the money necessary to purchase any drugs at Larry's residence, but would go on to talk to Larry for about an hour to an hour and a half in the yard.

Mr. Malone testified that he saw Anthony, Mr. Thomas, and Ms. Springfield on Anthony's porch at the Duplex that night. Mr. Malone did not see Ms. Turner on Anthony's porch that evening but had seen her "once or twice" in the past. Mr. Malone's encounter with the group of people on Anthony's porch was brief. Mr. Malone testified that someone on the porch pointed a gun with a red laser beam in his direction and said, "Pop, I see you walking," to which Mr. Malone responded, "don't be doing that." Mr. Thomas responded "all right, Pop," and Mr. Thomas continued to stare at Mr. Malone as he walked away. Mr. Malone saw the Defendants' car parked across the street from the Duplex while he was there around midnight. Mr. Malone went to his wife's home on nearby Sydney Street after his encounter with the group of people on Anthony's porch. According to Mr. Malone, someone came to the door of his wife's house and notified him of the killings about thirty minutes after he had arrived there. After that, Mr. Malone and some other family members went to the Duplex where they saw police at the residence.

In November of 2015, Mr. Hawkins was identified as a suspect when officers were alerted that Mr. Hawkins had been boasting to a woman named Jasmine Dorris ("Ms. Dorris") on a digital messaging application that he had killed Anthony.[15] Ms. Dorris asserted that she and Mr. Hawkins were in an "intimate" relationship and that Mr. Hawkins

---

[14] At trial, Mr. Hankins denied visiting the Duplex on September 25, 2015, and further denied engaging in the conversations Jerrico allegedly overheard.

[15] Specifically, Mr. Hawkins' message to Ms. Dorris read, "[t]he last time you talk all that s*** by listening to a fat M[other]F[*****]. But guess what, I murked that n****."

was her "boyfriend."[16]   Ms. Dorris testified that Mr. Hawkins sent the incriminating message after she had declined his proposals to reconcile their alleged relationship. Detective Dandridge interviewed Ms. Dorris on November 23, 2015.   Officers took photocopies of the incriminating messages at the meeting and later requested Mr. Hawkins' phone records from AT&T to determine who Mr. Hawkins had communicated with around the time of the homicides.   Because officers sought to build a case against Mr. Hawkins, they did not arrest him immediately following the interview.

Mr. Hawkins was eventually arrested around 3 p.m. on May 10, 2016, at his then-place of employment, the Peabody Hotel.   Detective Dandridge questioned Mr. Hawkins at the Memphis Homicide Bureau's office after his arrest.   Once the police were ready to take a statement from Mr. Hawkins, they brought in a transcriber to document the questions and Mr. Hawkins' answers.[17]   After the transcription of Mr. Hawkins' statement was finished, the transcriber printed a copy of the eight-page statement for Mr. Hawkins to review, initial, and sign.   After he signed the statement, Mr. Hawkins was charged with the murders of Anthony, Ms. Springfield, and Mr. Glover.   Detective Dandridge testified that, although officers "could have" charged Mr. Thomas and Ms. Turner at the same time as Mr. Hawkins, they were not arrested until after Mr. Hawkins had been indicted.

Although Mr. Hawkins ultimately confessed to the murders on the date of his arrest, Mr. Hawkins testified on cross-examination that he had initially lied to officers and claimed that he was not involved in the murders.   Mr. Hawkins admitted that, even after he had confessed his involvement to law enforcement, the story he gave in the police statement was riddled with falsehoods.[18]   According to Mr. Hawkins, after "a couple [of] hours [of questioning]" he decided to "[tell] them the truth[,] or half of the truth anyway."   Yet, in phone calls made to a girlfriend and his mother shortly after Mr. Hawkins' statement was finalized, Mr. Hawkins maintained his innocence and alleged that Detective Dandridge had coerced him into confessing to the murders.   Mr. Hawkins testified that he did not come clean to his mother about the murders until a visitation he had with her that took place just a few days before the Defendants' trial.

Mr. Hawkins testified that he became a Vicelord at the age of fifteen when his good friend, Mr. Martin, helped get him involved with the gang.   He became involved in the plot to kill Anthony when he attended a brief, fifteen to thirty-minute Vicelord meeting at the residence of Mr. Hankins in Binghampton, Memphis, on September 25, 2015, at around

---

[16] In his testimony, Mr. Hawkins denied the existence of an intimate relationship between himself and Ms. Dorris.

[17] Detective Dandridge testified that Mr. Hawkins' statement was also recorded on an audio recorder.

[18] Mr. Hawkins testified that, in addition to making false statements to the police in his initial statement, he lied to prosecutors on subsequent occasions.

4:30 p.m.[19]  Mr. Hawkins was out buying cigars when he ran into Timothy Jones ("Mr. Jones"), a fellow member of the Vicelords, who invited him to attend the meeting.

Mr. Hawkins further testified that he and Mr. Jones were driven to the meeting by his friend Deshun Dye ("Mr. Dye"), who did not attend the meeting because Mr. Dye was not a member of the Vicelords.  Mr. Hawkins listed himself, Mr. Thomas, Mr. Jones, Ms. Turner, Mr. Hankins, Cory Hankins (also known as "Big Five"), and "one more person" as attendees of the Binghampton meeting.[20]  Mr. Hawkins claimed that, when Mr. Thomas proposed killing Anthony in retribution for Mr. Martin's death, the meeting attendees were "shock[ed]" by the suggestion.[21]  After the meeting had concluded and no one had initially volunteered to assist Mr. Thomas with the planned murder, Mr. Thomas pulled Mr. Hawkins aside and requested his assistance in killing Anthony.  Mr. Hawkins agreed to do so.

Mr. Hawkins insisted that, although he had a contentious relationship with Anthony, he "didn't want to [kill Anthony], but it was either [Anthony] or me."  Mr. Hawkins' relationship with Anthony had deteriorated after Mr. Hawkins was badly beaten in a fist fight by another Vicelord.  A video of the fight circulated, leading many, particularly Anthony, to poke fun at Mr. Hawkins over his defeat.[22]

Mr. Hawkins further testified that, following the alleged meeting at Mr. Hankins' house, he and Mr. Jones were picked up by Mr. Dye on Nathan Street and driven to Zena's Market.  Mr. Hawkins informed Mr. Jones that Mr. Thomas had asked him to help kill Anthony.  Mr. Jones attempted to discourage Mr. Thomas from participating in the plan, but Mr. Hawkins maintained his intent to help Mr. Thomas kill Anthony.  Mr. Hawkins testified that he spent the rest of the day "[w]alk[ing] around [the] neighborhood, smok[ing] [marijuana] blunts . . . then . . . calling females up . . . [un]til probably about [ten] or [eleven o'clock] at night."

According to his trial testimony, an unarmed Mr. Hawkins, clothed in a black shirt and black jean shorts with gloves on his hands, walked from his house to a Grizzly Mart

---

[19] At trial, Mr. Hankins denied any acquaintance with Mr. Hawkins and denied that any meeting took place at his residence on September 25, 2015.

[20] Mr. Hawkins admitted that he had initially lied to Detective Dandridge by alleging that there were thirteen people at the meeting.

[21] Mr. Hawkins' statement to police had claimed that, rather than solely targeting Anthony, the plan was to walk into the Duplex and shoot the first person in sight.

[22] According to Mr. Hawkins, Anthony was also responsible for showing Ms. Dorris the video, leading Ms. Dorris to mock Mr. Hawkins and brag about the video.

gas station around 11:30 p.m.[23]  At the gas station, he met up with Mr. Dye and asked Mr. Dye for a ride.  Mr. Hawkins lied to Mr. Dye, telling Mr. Dye that he needed to go to his "cousin['s] house . . . [o]ff of Warford and Chelsea."  Mr. Dye obliged, driving him to the requested destination in what Mr. Hawkins described as a "white [two-door] Toyota" and dropping him off around midnight.[24]  Mr. Hawkins claimed that he initially had concealed Mr. Dye's involvement so that Mr. Dye "wouldn't get in trouble."

After Mr. Hawkins was dropped off by Mr. Dye, he walked through a field until he reached a house that neighbored Anthony's.  Mr. Hawkins heard Mr. Thomas, wearing a red "Richlord" shirt and a hat, call out Mr. Hawkins' nickname, "D-Money," at which point Mr. Hawkins entered the back seat of Mr. Thomas' vehicle.  Ms. Turner was in the front passenger seat of Mr. Thomas' car.  Mr. Hawkins described the car as "burgundy, red. Something like that."

Mr. Hawkins further testified that, after he took a seat in the car, Mr. Thomas asked Mr. Hawkins if he was "ready to handle a little business."  Mr. Hawkins responded in the affirmative and grabbed a nine-millimeter handgun from underneath his seat upon Mr. Thomas' request.  Mr. Hawkins approached Anthony's door with Mr. Thomas.  Mr. Thomas knocked on the door and, after Anthony opened the door, Mr. Thomas shot Anthony with a Glock 17 semi-automatic pistol.  Shortly after Mr. Thomas fired the first shot, Mr. Hawkins also shot Anthony, knocking him to the ground.  Mr. Thomas fired an additional shot at Anthony after he fell.

After Mr. Hawkins and Mr. Thomas shot Anthony, Mr. Glover ran to the back of the Duplex in an effort to escape the situation.  Mr. Thomas chased after Mr. Glover and fired two shots.  Mr. Hawkins, following closely behind Mr. Thomas, also fired a shot at Mr. Glover.  Mr. Hawkins stated that he then saw a woman, later identified as Ms. Springfield, attempt to jump out of the window and fired shots in her direction, leading her to fall to the floor.  Mr. Hawkins stood by for a moment, at which point Ms. Turner entered the room.

Mr. Hawkins testified as to Ms. Turner's alleged involvement in the crimes:

Q: What happens when [Ms. Turner] comes in?
A: She comes in, she see[s] [Anthony is] laying down, she see[s] [Mr. Glover is] laying down, [and] she see[s] her laying down, [Ms. Springfield].
Q: Did she come in the back room?

---

[23] In his initial statement to police, Mr. Hawkins alleged that the murders took place around nine or ten in the evening.

[24] In his initial statement to police, Mr. Hawkins stated that he rode to the Duplex in Ms. Turner's vehicle.

A: Yes, sir.

. . .

Q: What happens [then]?
A: She asked [whether Ms. Springfield was] dead. I said ["]I guess so,["] so she asked [if she] could see the gun, my gun. I gave it to her, [and] she fired a shot at [Ms. Springfield].[25]

Mr. Hawkins testified that, as Ms. Turner shot Ms. Springfield, Mr. Thomas stole guns and money from the duplex. Mr. Hawkins and Mr. Thomas exited the Duplex together and entered the car, with Mr. Hawkins entering the back seat of the vehicle on the driver's side and Mr. Thomas going to the driver's seat. Ms. Turner entered the front passenger seat shortly thereafter, holding some marijuana in her hand that she had stolen from the Duplex. At trial, Mr. Hawkins commented, "I guess she dropped the jar [holding the marijuana] because I heard some glass break. So, I guess that was the weed jar that hit the ground. We got in the car and left."

Mr. Hawkins testified that once he, Mr. Thomas, and Ms. Turner entered the car to leave the scene of the killings, they "[t]urn[ed] left, went down Warford, and then they dropped [Mr. Hawkins] off . . . on National and Macon." After he was dropped off, he threw his gloves away in a nearby garbage can and returned home. Mr. Hawkins claimed he had no further communication about the homicides until he sent the incriminating message to Ms. Dorris that ultimately led to his arrest.

Dr. Marco Ross ("Dr. Ross") was called to testify at trial by the State and was certified by the trial court as an expert in forensic pathology. Dr. Ross testified that Anthony was shot three times in the head, nine times in the torso, once in his right buttock, and once in his left arm, totaling fourteen gunshot wounds. Anthony had an additional graze wound from a bullet on his shoulder. Dr. Ross classified Anthony's cause of death as "[m]ultiple gunshot wounds" and Anthony's manner of death was certified as a homicide. Ms. Springfield sustained three gunshot wounds, one with an entrance on the left side of her face that went into her skull, one underneath the chin that went through her mouth region, and one to the right wrist region of her body. Dr. Ross classified Ms. Springfield's manner of death as a homicide.

Like the other victims, Mr. Glover had been shot multiple times:

[Mr. Glover] had a gunshot wound to the left eyebrow region, he had a gunshot entrance wound on the . . . left side of his neck, gunshot entrance

---

[25] In his initial police statement, Mr. Hawkins claimed that Mr. Thomas had first shot Anthony, then Ms. Springfield, and lastly Mr. Glover, contrasting his trial testimony in which Mr. Hawkins claimed that only he and Ms. Turner had shot Ms. Springfield. Mr. Hawkins' statement to police did not implicate Ms. Turner in the killings at all.

wound there. He had another gunshot wound to the top of the right shoulder, and a gunshot wound to his back, and a gunshot wound to his left hip, and . . . two gunshot wounds to the, sort of, right buttock, right thigh region. And then two graze gunshot wounds on his abdomen and two graze gunshot wounds on his back.

Dr. Ross classified Mr. Glover's cause of death as "[m]ultiple gunshot wounds" and stated that Mr. Glover's death was also a homicide.

The Defendants called Kasia Lynch ("Ms. Lynch"), a firearms examiner employed by the Tennessee Bureau of Investigation and assigned to the Memphis Crime Lab, as an expert witness to testify about the weapons that were recovered from the Duplex. Ms. Lynch became involved with the case after her department received a request for analysis on the evidence associated with the case. Ms. Lynch stated that she works with "anything related to guns. Guns, bullets, and cartridge cases." Ms. Lynch described her work, testifying that, "I look at cartridge cases and bullets . . . to determine if they have been fired in a specific firearm or not . . . . by using a comparison microscope . . . [that] allows me to look at two items of evidence under the same magnification and compare them side by side."

Ms. Lynch testified that, in this case, she "received a total of [twelve] bullets or bullet fragments as well as [twenty-one] nine[-]millimeter caliber cartridge cases[,] . . . one .380 auto cartridge case, . . . and [forty] .22 caliber cartridge cases." She explained that she compares "like calibers" to one another:

> I was able to determine that [ten] of them had been fired in one nine[-]millimeter gun, one of them had been fired in a second nine[-]millimeter gun, and then another [ten] of them had been fired in a third nine[-]millimeter gun. The .380 caliber cartridge case is a different caliber, so that was fired in a separate gun, and then all [forty] of the .22 long rifle caliber cartridge cases were fired in the same gun as one another. In examining the bullets and bullet fragments, I was able to determine that two of them could have been fired in the same gun as one another, but there wasn't quite enough there for me to say that they were certainly fired the same as one another. But I was able to determine that eight of them had been fired in a different gun than the first two, but those ones, again, I wasn't able to determine if they were fired in the same gun as one another just because the marks that I'm looking [at] weren't sufficient enough for me to determine for sure that they were fired in one gun. But I can tell that there were two different guns based on the bullets that I have.

The State called Reuben Ramirez ("Mr. Ramirez"), a law enforcement officer working in the inmate phone monitoring department of the Shelby County Sheriff's Office,

to testify. During Mr. Ramirez' testimony, a joint stipulation of fact was entered into the record, indicating that an audio recording played for the jury at trial "fairly and accurately reflects content from a telephone call made from the Shelby County Jail on September 20, 2017." In that phone call, made by Mr. Thomas to Deangelo Leachman ("Mr. Leachman"), a cousin of Ms. Turner, Mr. Thomas asked Mr. Leachman to tell Ms. Turner not to accept a probation offer she had been provided. Mr. Thomas said in the call that accepting the probation offer would be "like a sign of guilt" and that Ms. Turner needed to "stick to the script" rather than be "tricked" into taking the probation offer. Additionally, they discussed their view that the State's case was a weak one, given a perceived lack of evidence placing the Defendants at the Duplex during the murders and Mr. Hawkins' testimony, which they considered unreliable and inconsistent.

Following deliberations, the jury convicted both Defendants of three counts of first-degree premeditated murder. The trial judge sentenced each defendant to life in prison on each count.

The Defendants subsequently filed motions for a new trial on several grounds. The Defendants first alleged that the State had violated Tennessee Rule of Professional Conduct 3.8(d), which requires "timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense," as well as the Brady disclosure rule, which, for due process purposes, requires the prosecution to provide a defendant with favorable evidence that is material to guilt or punishment. See Tenn. Sup. Ct. R. 8, RPC 3.8(d); Brady v. Maryland, 373 U.S. 83 (1963). Prior to trial, the trial judge ordered the State to disclose inconsistent statements when "the witness is asked something in your proffer sessions [and] the answer . . . should have included the original detail and did not give it and then later upon further . . . review shared [the detail] . . . that common sense would say they should have." The Defendants argued in their motions for a new trial that the State failed to disclose all inconsistent statements made by Mr. Hawkins at proffer sessions. According to the Defendants, disclosure of the requested statements was not made until trial, when the Defendants could no longer "make use of the information disclosed."

The Defendants also argued that the evidence was insufficient to support their convictions and that Mr. Hawkins' testimony was not reliable nor sufficiently corroborated. Counsel for Mr. Thomas contended that, although "Mr. Hawkins' testimony in part was corroborated by other elements of the evidence. . . . [I]n larger part it did not accord with the evidence." Accordingly, the Defendants requested that the trial court utilize its power under Rule 33(d) of the Tennessee Rules of Criminal Procedure to "grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d).

The Defendants' motions for a new trial ultimately were denied by the trial court. Subsequently, the Defendants timely appealed to the Court of Criminal Appeals of

Tennessee at Jackson. State v. Thomas, No. W2019-01202-CCA-R3-CD, 2021 WL 5015255, at *12 (Tenn. Crim. App. Oct. 28, 2021), perm. app. granted, (Tenn. Apr. 14, 2022). The Court of Criminal Appeals addressed five issues raised by the Defendants on appeal. Id. A majority of the intermediate appellate court affirmed that the evidence was sufficient to support the convictions of both Defendants, citing "adequate corroboration, however slight." Id. at *16. Additionally, the majority did not find a Brady violation, instead stating in its opinion that "disclosure of the proffer statements would not have affected the Defendants' trial strategy or preparation of their cases" and that "the State's failure to disclose favorable information in this case does not undermine our confidence in the outcome of this trial." Id. at *28. The intermediate appellate court unanimously sided with the State on the other three issues. Id. at *20–21, *30, *32. Accordingly, the Court of Criminal Appeals affirmed the judgments of the trial court. Id. at *32.

Judge Camille R. McMullen ("Judge McMullen") dissented, noting her disagreement with the majority's conclusions that the evidence was sufficient to sustain Ms. Turner's convictions and that the State did not commit a Brady violation based on its failure to disclose Mr. Hawkins' inconsistent statements. Id. (McMullen, J., dissenting). In Judge McMullen's view, the record did not reflect sufficient corroboration with regard to Ms. Turner's three convictions for first degree premeditated murder. Id. Judge McMullen would have reversed Ms. Turner's convictions and dismissed the charges. Id. Judge McMullen further opined that the record demonstrated a Brady violation on the part of the State and that, as a result, the Defendants should have had their motions for a new trial granted. Id.

The Defendants appealed the decision of the Court of Criminal Appeals in accordance with Rule 11 of the Tennessee Rules of Appellate Procedure. This Court granted the appeal on a limited basis on April 14, 2022, and heard oral arguments on April 5, 2023, in Jackson, Tennessee.

## II. ANALYSIS

In this appeal, although the Defendants both raised several issues in their respective Rule 11 applications, the Court only agreed to consider whether the evidence was sufficient to support Ms. Turner's convictions for first-degree murder and whether, as to both Defendants, the prosecution breached its obligations under Brady by failing to produce statements made by Mr. Hawkins in proffer conferences that were inconsistent with Mr. Hawkins' formal statement to law enforcement. Because we conclude that the evidence is insufficient to sustain Ms. Turner's convictions, it is unnecessary to address the Brady issue raised by Ms. Turner.

- 14 -

## A. Sufficiency of the Evidence

The State encourages us to abolish the court-made rule requiring accomplice corroboration to sustain a conviction. This argument directly impacts the sufficiency of the evidence issue with regard to the conviction of Ms. Turner. As a result, we find it necessary to address this issue at the beginning of our analysis. This is a proper consideration for our Court, as we do not "hesitate[] to abolish obsolete common-law doctrines," especially when "it is the Court, rather than the Legislature, which has recognized and nurtured the action." Dupuis v. Hand, 814 S.W.2d 340, 345 (Tenn. 1991) (quoting Hanover v. Ruch, 809 S.W.2d 893, 896 (Tenn. 1991)). Given that another state jurisdiction repealed a similar judicially-created rule just five years ago, see State v. Jones, 216 A.3d 907 (Md. 2019), leaving Tennessee as the sole state still utilizing such a rule on a common-law basis, we find it worthwhile to consider the State's proposition as part of our analysis. After we decide the status of this rule, we will address whether the evidence is sufficient to support Ms. Turner's first-degree murder convictions in this case.

### i. The Accomplice-Corroboration Rule

It has long been a common law rule in our state that "evidence is insufficient to sustain a conviction" when the conviction is "solely based upon the uncorroborated testimony of one or more accomplices." State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing State v. Little, 402 S.W.3d 202, 211–12 (Tenn. 2013)); see also Clapp v. State, 30 S.W. 214, 216–17 (Tenn. 1895). "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004) (citing State v. Lewis, 36 S.W.3d 88, 94 (Tenn. Crim. App. 2000); Conner v. State, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975)). A witness qualifies as an accomplice if that witness "could be indicted for the same offense charged against the defendant." Collier, 411 S.W.3d at 894 (quoting Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). Our Court has described the accomplice-corroboration rule as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense,

- 15 -

> although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (alteration in original) (first citing State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992); then quoting Hawkins v. State, 469 S.W.2d 515 (Tenn. Crim. App. 1971)). The State heavily criticizes the accomplice-corroboration rule in its brief. The State implores our Court to "abandon the rule," which the State claims is "out of step with the principles underlying sufficiency analysis . . . [and] is also out of step with the clear majority of jurisdictions."

Tennessee's accomplice-corroboration rule, like comparable rules in other jurisdictions, is justified by the theory that accomplice testimony is unique and must be considered with a different degree of scrutiny than other testimony. See, e.g., Christine J. Saverda, Accomplices in Fed. Ct.: A Case for Increased Evidentiary Standards, 100 Yale L.J. 785, 786 (1990). Because accomplices often have an incentive to shape their testimony in a manner that could help them curry favor with the prosecution and the police, and because an accomplice's status as a guilty party with inside knowledge of the situation can make the jury more susceptible to believe his testimony, proponents of accomplice-corroboration rules see such rules as a necessary safeguard for criminal defendants. See id. at 786–87; see also Jones, 216 A.3d at 916. The contrary view is that, although valid concerns regarding the credibility of accomplice testimony certainly exist, accomplice-corroboration rules unduly interfere with the jury's factfinding role and the role of the jury to evaluate witness credibility. See, e.g., Jones, 216 A.3d at 919. The overwhelming majority of jurisdictions, including thirty-three state jurisdictions,[26] the District of

---

[26] See Ariz. Rev. Stat. Ann. § 13-302; Davis v. People, 490 P.2d 948, 950 (Colo. 1971); State v. Johnson, 179 A.3d 780, 786 (Conn. 2017) (citing State v. Heno, 174 A. 181, 182 (1934)); Brooks v. State, 40 A.3d 346, 350 (Del. 2012); Smith v. State, 507 So. 2d 788, 790 (Fla. Dist. Ct. App. 1987); State v. Carvelo, 361 P.2d 45, 59 (Haw. 1961); People v. Williams, 166 N.E.2d 568, 571 (Ill. 1960) (citing People v. Hermens, 125 N.E.2d 500, 504 (Ill. 1955)); Smith v. State, 475 N.E.2d 1139, 1141 (Ind. 1985) (citing Smith v. State, 455 N.E.2d 346, 350 (Ind. 1983)); State v. Shepherd, 516 P.2d 945, 952 (Kan. 1973) (quoting State v. McIntyre, 294 P. 865 (Kan. 1931)); Martin v. Commonwealth, 409 S.W.3d 340, 344 n.1 (Ky. 2013); State v. Dorsey, 74 So. 3d 603, 634 (La. 2011) (citing State v. Matthews, 450 So. 2d 644, 647 (La. 1984); State v. Hopkins, 897 So. 2d 854, 892 (La. Ct. App. 2005)); State v. Jewell, 285 A.2d 847, 851 (Me. 1972); Jones, 216 A.3d at 919; Commonwealth v. DeBrosky, 297 N.E.2d 496, 504 (Mass. 1973) (citing Commonwealth v. Taber, 213 N.E.2d 868 (Mass. 1966)); People v. Barron, 163 N.W.2d 219, 221 (Mich. 1968); Ballenger v. State, 667 So. 2d 1242, 1253 (Miss. 1995) (quoting Mason v. State, 429 So. 2d 569, 571 (Miss. 1983)); State v. Tressler, 503 S.W.2d 13, 17 (Mo. 1973); State v. Oglesby, 195 N.W.2d 754, 755 (Neb. 1972) (citing Jungclaus v. State, 104 N.W.2d 327, 331 (Neb. 1960)); State v. Fraser, 411 A.2d 1125, 1128 (N.H. 1980); State v. Begyn, 167 A.2d 161, 171 (N.J. 1961) (citing State v. Hyer, 39 N.J.L 598, 602 (N.J. 1877)); State v. Gutierrez, 408 P.2d 503, 505 (N.M. 1965); State v. Tilley, 79 S.E.2d 473, 476 (N.C. 1954); State v. O'Dell, 543 N.E.2d 1220, 1225 (Ohio 1989); Commonwealth v. Mikell, 729 A.2d 566, 570 (Pa. 1999); State v. DeMasi, 413 A.2d 99, 100 (R.I. 1980) (citing State v. Pella, 220 A.2d 226, 230 (R.I. 1966)); State v. Givens, 225 S.E.2d 867, 869 (S.C.L. 1976) (citing State v. Brown, 34 S.C.L. 508 (S.C. 1849)); Utah Code Ann. § 77-17-7(1); State v. Briggs, 568 A.2d 779, 783 (Vt. 1989); Blount v. Commonwealth, 195 S.E.2d 693, 695 (Va. 1973) (citing Brown v. Commonwealth, 158 S.E.2d 663, 666

Columbia,[27] three federal territorial jurisdictions,[28] twelve federal circuit courts of appeal,[29]/[30] and the United States Supreme Court,[31] have either declined to adopt an accomplice-corroboration rule or have repealed such a rule. While certainly not bound by the decisions and statutes of these other jurisdictions, we find it helpful to consider them when we re-evaluate our common law rule. See, e.g., Collier, 411 S.W.3d at 897–98 (considering the "preferable course" of action taken by the majority of state courts with

(Va. 1968)); State v. Johnson, 462 P.2d 933, 943 (Wash. 1969) (citing State v. Badda, 385 P.2d 859, 862 (Wash. 1963); State v. Eichman, 418 P.2d 418, 420 (Wash. 1966)); State v. Vance, 262 S.E.2d 423, 426 (W. Va. 1980); Linse v. State, 286 N.W.2d 554, 558 (Wis. 1980) (citing Kutchera v. State, 230 N.W.2d 750, 758 (Wis. 1975)); Vlahos v. State, 75 P.3d 628, 636 (Wyo. 2003) (citing Vigil v. State, 926 P.2d 351, 360 (Wyo. 1996)).

[27] See Mathis v. United States, 513 A.2d 1344, 1350 (D.C. 1986).

[28] See 8 Guam Code Ann. § 95.10; 5 V.I. Code Ann. § 740; Pueblo v. Baez Figueroa, No. DOP2009G0092, 2012 WL 6931128, at *10 (P.R. Cir. Dec. 21, 2012).

[29] See United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000); United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990) (citing United States v. Bernstein, 533 F.2d 775, 791 (2d Cir. 1976)); United States v. De Larosa, 450 F.2d 1057, 1060 (3d Cir. 1971) (citing Caminetti v. United States, 242 U.S. 470, 495 (1917)) (additional citations omitted); United States v. Manbeck, 744 F.2d 360, 392 (4th Cir. 1984) (citing United States v. Figurski, 545 F.2d 389, 392 (4th Cir. 1976); United States v. Clark, 541 F.2d 1016, 1018 (4th Cir. 1976); United States v. Miller, 451 F.2d 1306, 1307 (4th Cir. 1971)); United States v. Perry, 35 F.4th 293, 317 (5th Cir. 2022) (citing United States v. Villegas-Rodriguez, 171 F.3d 224, 228 (5th Cir. 1999)); United States v. Haynes, 403 F.2d 54, 55 (6th Cir. 1968) (citing Cont'l Baking Co. v. United States, 281 F.2d 137, 155 (6th Cir. 1960)); United States v. Platt, 156 F.2d 326, 327 (7th Cir. 1946) (citing United States v. Glasser, 116 F.2d 690, 703 (7th Cir. 1940); United States v. Riedel, 126 F.2d 81, 82 (7th Cir. 1942)); United States v. Cole, 449 F.2d 194, 197 (8th Cir. 1971); Williams v. United States, 308 F.2d 664, 666 (9th Cir. 1962); United States v. Gunter, 546 F.2d 861, 869 (10th Cir. 1976) (citing United States v. Downen, 496 F.2d 314, 318 (10th Cir. 1974); Johns v. United States, 227 F.2d 374, 375 (10th Cir. 1955)); United States v. Broadwell, 870 F.2d 594, 601 (11th Cir. 1989) (citing United States v. Trevino, 565 F.2d 1317, 1319 (5th Cir. 1978)); United States v. Lee, 506 F.2d 111, 118 (D.C. Cir. 1974).

[30] The only federal circuit court of appeal that has not formally declined to adopt an accomplice corroboration rule is the Court of Appeals for the Federal Circuit. This anomaly can likely be attributed to the fact that the Federal Circuit is a court of limited jurisdiction that does not hear criminal cases. See, e.g., Court of Appeals for the Federal Circuit, USA.gov, https://www.usa.gov/agencies/court-of-appeals-for-the-federal-circuit (last visited Feb. 27, 2024).

> With a national jurisdiction, the Court of Appeals for the Federal Circuit hears appeals on patent and certain civil cases from courts such as the U.S. Court of International Trade and the Court of Federal Claims, among others. The Court of Appeals for the Federal Circuit may also review the administrative rulings of the Patent and Trademark Office, the Secretary of Commerce and other agencies.

[31] Caminetti v. United States, 242 U.S. 470, 495 (1917) ("[T]here is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them.").

regard to corroboration requirements for child sexual offenses). Just sixteen other states continue to utilize an accomplice-corroboration rule, and all sixteen do so by statute or procedural rule.[32] Today, we adopt the majority view and abolish the accomplice-corroboration rule, but we do so only on a prospective basis.

Our State's accomplice-corroboration rule can be traced back to the late nineteenth century. See, e.g., Shelley v. State, 31 S.W. 492 (Tenn. 1895); see also Clapp, 30 S.W. 214; Robinson v. State, 84 Tenn. 146 (Tenn. 1885); Hall v. State, 71 Tenn. 552 (Tenn. 1879). In subsequent years, the accomplice-corroboration rule remained staunchly intact, with our Court going so far as to create an exception to the rule that required that "a child as an accomplice should be corroborated," Sherrill v. State, 321 S.W.2d 811, 816 (Tenn. 1959), "even where the accomplice is a child of such tender years as to be incapable of consenting to such crime." Scott v. State, 338 S.W.2d 581, 583 (Tenn. 1960) (citing Sherrill, 321 S.W.2d at 814–16). While under the normal accomplice corroboration standard one must be subject to indictment, that exception applied to minors legally incapable of being charged with sex crimes because of their age. Collier, 411 S.W.3d at 895–96 (citing Monts, 379 S.W.2d at 43).

In 1991, the General Assembly limited that policy, mandating that victims less than thirteen years of age, "regardless of consent, [shall] not be considered to be an accomplice to sexual penetration or sexual contact, and no corroboration of the alleged victim's testimony shall be required to secure a conviction if corroboration is necessary solely because the alleged victim consented." Act of Apr. 29, 1991, ch. 719, § 1, 1991 Tenn. Pub. Acts 430 (codified at Tenn. Code Ann. § 40-17-121). In 2013, our Court extended the changes made by the General Assembly to minors aged thirteen through seventeen, "join[ing] the vast majority of states that have addressed the issue by rejecting the application of the accomplice[-]corroboration rule to victims of statutory rape." Collier, 411 S.W.3d at 891, 898. Despite noting our Court's typical hesitancy in overruling previous decisions, the Collier Court concluded that there was not a valid basis to maintain a minority view "which needlessly and improperly frustrates the prosecution of sex offenses involving minor victims," and recognized that there was "no reason to impose a more demanding standard for other sex offenses, such as statutory rape, where minor victims are by definition excluded from being charged." Id. at 899.

Today, we abolish Tennessee's court-made accomplice-corroboration rule in its entirety. State v. Jones, a similar case decided by the Supreme Court of Maryland in

---

[32] See Ala. Code § 12-21-222; Alaska Stat. § 12.45.020; Ark. Code Ann. § 16-89-111(e); Cal. Penal Code § 1111; Ga. Code Ann. § 24-14-8; Idaho Code Ann. § 19-2117; Iowa R. Crim. Proc. 2.21(3); Minn. Stat. § 634.04; Mont. Code Ann. § 46-16-213; Nev. Rev. Stat. § 175.291; N.Y. Crim. Proc. Law § 60.22; N.D. Cent. Code § 29-21-14; Okla. Stat. tit. 22 § 742; Or. Rev. Stat. § 136.440; S.D. Codified Laws § 23A-22-8; Tex. Code Crim. Proc. Ann. art. 38.14.

2019,[33] aids in our reasoning for abolishing the common law rule. 216 A.3d 907. In Jones, a man died after he was shot several times and left lying next to his vehicle. Id. at 909. Investigation of the killing ultimately led the police to identify several suspects, one of whom "was implicated solely by the accounts of" the other suspects. Id. The defendant who was identified only by his accomplices was ultimately convicted of conspiracy to commit armed carjacking. Id. at 911. The defendant then moved for a new trial on the basis that "the accomplices' testimony lacked the requisite independent corroboration" required under Maryland's common law accomplice-corroboration rule. Id.

A three-judge panel of the Appellate Court of Maryland[34] reversed the judgment, holding that the testimony of the accomplices was not independently corroborated by further evidence and the remaining evidence was legally insufficient to sustain the conviction. Jones v. State, No. 03-K-15-005488, 2018 WL 3770206, at *6 (Md. Ct. Spec. App. Aug. 8, 2018), perm. app. granted, (Md. Aug. 28, 2019). In its opinion, the intermediate appellate court proposed that the Supreme Court of Maryland may be inclined to reconsider the state's accomplice-corroboration rule in its then-current form, with Judge Matthew J. Fader writing that "we are skeptical that the accomplice[-]corroboration rule strikes the best balance between the potential dangers of accomplice testimony and its potential value." Id. (citing Turner v. State, 452 A.2d 416, 417 (Md. 1982)).

Ultimately, the State filed a petition for a writ of certiorari, which the Supreme Court of Maryland granted. Jones, 216 A.3d at 911. The State raised two questions, one challenging whether sufficient evidence was provided to corroborate the accomplice testimony and the other asking, in the alternative, whether the state's accomplice-corroboration rule should be "replaced or revised" altogether. Id. The Supreme Court of Maryland affirmed the judgment of the intermediate appellate court reversing the defendant's conviction with regard to the first question, holding that "the State failed to corroborate the accomplices' testimony." Id. at 915.

Next, the Supreme Court of Maryland considered the proposed abrogation of the state's accomplice-corroboration rule. Id. at 915–20. The majority of the Supreme Court of Maryland endorsed criticisms directed towards accomplice-corroboration rules. Id. The court criticized the rule for "operat[ing] indiscriminately regardless of the apparent credibility of the accomplices." Id. at 917. Under the accomplice-corroboration rule, "a

---

[33] In 2019, Maryland's highest appellate court was named the Maryland Court of Appeals. In 2022, Maryland voters approved a constitutional amendment renaming its highest court the Supreme Court of Maryland. Maryland Government Relations and Public Affairs, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland, (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214.

[34] The 2022 constitutional amendment that renamed the highest court of the state also changed the name of the state's intermediate appellate court from the Court of Special Appeals of Maryland to the Appellate Court of Maryland. Id.

- 19 -

factfinder's consideration of evidence she or he might conclude is highly reliable can be forbidden in one case, while in a different case the same factfinder may be permitted to weigh a much lesser quantum of much more suspect evidence." Id. (quoting Jones, 2018 WL 3770206, at *7). The court further opined that "[t]he arbitrariness of the accomplice[-]corroboration rule is amplified when one considers that there is no similar rule for other interested witnesses," such as jailhouse informants, accessories after-the-fact, and expert witnesses paid to testify. Id. The court further criticized the accomplice-corroboration rule's tendency to arbitrarily show preference towards bystander testimony over accomplice testimony, and the tendency of the rule to undermine the "fundamental principle . . . that, in a criminal case tried before a jury, assessing a witness's credibility is a matter solely for the jury." Id. at 917–18 (quoting Devincentz v. State, 191 A.3d 373, 379 (Md. 2018)).

Ultimately, the Supreme Court of Maryland concluded that "a blanket rule requiring corroboration for accomplices intrudes too far into the jury's constitutional role as factfinder and unnecessarily and arbitrarily deprives the jury of the opportunity to assess and decide the credibility of potentially highly relevant evidence." Id. at 919. The Supreme Court of Maryland held that:

Procedurally, the trial court no longer needs to determine on the front end . . . whether, as a matter of law, the State has provided corroborative evidence to send the case to the jury. Instead, after accomplice testimony is presented, the court only needs to issue a cautionary jury instruction. Once that instruction is issued, the weight and credibility of the accomplice testimony is left entirely to the jury to decide.

Id. at 919 n.9. The court held that, "in criminal jury trials, the courts should disturb as little as possible the jury's role of factfinder . . . . This deference to the jury restores the balance between the concerns underlying accomplice testimony and its potential benefits. Id. at 920.

Although "[t]he power of this Court to overrule former decisions is very sparingly exercised and only when the reason is compelling," Collier, 411 S.W.3d at 899 (quoting In re Estate of McFarland, 167 S.W.3d 299, 306 (Tenn. 2005)) (internal quotations omitted), we will do so when "there is no valid basis to uphold the minority view." Id. For example, in State v. Rogers, our Court abolished the common law year-and-a-day rule, characterizing the rule as "obsolete." 992 S.W.2d 393, 394 (Tenn. 1999). In that case, our Court considered the modern status of the common law rule in general, as well as the modern status of the rule in Tennessee, to determine whether the rule should be abolished. Id. at 397–401. Regarding the modern status of the rule, our Court wrote that, "[d]espite its early common law recognition and near universal acceptance, the [year-and-a-day] rule has fallen into disfavor and has been legislatively or judicially abrogated by the vast majority of jurisdictions which have recently considered the issue." Id. at 397. In Rogers, we cited

advances in medical science, improved trial procedure, and sentencing reform as reasons that most courts had come to describe the rule as "outmoded," "obsolete," and an "anachronism," and used those same justifications for abrogating the rule in Tennessee. Id. at 397, 401.

We do not view this case as directly analogous to Rogers because, unlike the "obsolete" common law year-and-a-day rule, (1) valid concerns regarding the reliability of accomplice testimony still exist and (2) sixteen state jurisdictions still observe a rule similar to the one we choose to abolish today, albeit all do so by statute or by rule of criminal procedure. Nevertheless, Rogers is helpful to our analysis because the common law rule we are tasked with considering abolishing today "has been . . . judicially abrogated . . . recently" by the highest court of the only other state that had maintained such a rule on a common law basis. See id. at 397; see also Jones, 216 A.3d at 919–20. Although we do not consider the accomplice-corroboration rule to be "obsolete" as a statutory or procedural rule, we conclude that the rule is now effectively "obsolete" in a common law context and that the General Assembly is better suited to decide whether such a rule need be effectuated in our state.

It is further necessary to explain why we choose to apply this change to the common law on a prospective basis only. The State acknowledges that, when a change to a common law rule is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," changes to such rules in criminal cases need be applied on a prospective-only basis so as to avoid violation of due process protections. Rogers v. Tennessee, 532 U.S. 451, 462 (2001) (quoting Bouie v. City of Columbia, 378 U.S. 347, 354 (1964)). However, the State argues that it would not be unfair to apply the rule change to this case "because Tennessee is the last State in the country that requires corroboration as a common-law rule . . . [a]nd this Court has retroactively applied similar sufficiency standards when it has abandoned a long-standing rule."

Just because a court can do something, does not necessarily mean that it should. In Jones, the Supreme Court of Maryland noted that the United States Supreme Court had considered retroactive application of a Texas statute repealing corroboration requirements as "grossly unfair" because it would have "lowered the quantum of evidence required" to secure a conviction. 216 A.3d at 920–21 (citing Carmell v. Texas, 529 U.S. 513, 532, 544–47 (2000)) (internal quotation omitted). The Supreme Court of Maryland chose to apply its rule change prospectively only, so as to avoid "holding that a conviction can be sustained based on what was at the time of trial legally insufficient evidence." Id. at 921. "Doing so would be . . . ultimately unfair, because it would allow the State . . . to satisfy an evidentiary hurdle on appeal that it could not at trial." Id. Additionally, the Supreme Court of Maryland wrote that "[h]ad defense counsel known then that the rule might change post hoc, a different course, including the possibility of a plea bargain, likely would have been charted." Id. Accordingly, the Supreme Court of Maryland opted to abide by the elevated *Ex Post Facto* Clause standard, although it was not required to, because "the general

- 21 -

principles enunciated there appl[ied]" to the <u>Jones</u> case.  <u>Id.</u>  We ultimately agree with the Supreme Court of Maryland's approach and hold that, in the interest of fairness, we will apply the common law accomplice-corroboration rule to Ms. Turner's case, but the rule will be abolished in its current form going forward and that change shall be applied to all trials commencing after the date of the mandate.[35]  <u>See id.</u> at 924.

Justice Campbell's separate opinion expresses disagreement with our approach on this point, and argues that the abrogation of the accomplice corroboration rule should be applied retroactively to change the holding in this case and other pending cases that have not yet reached final judgment.  According to Justice Campbell:

> *First*, retroactivity has long been a hallmark of judicial decisionmaking. *Second*, our precedents consistently have applied overruling decisions in criminal cases retroactively even when they disadvantage the defendant. *Third*, prospective overruling gives the Court too much discretion and poses a significant threat to stare decisis.

We do not question or deny that the consideration of retroactive application holds an important place in judicial decisionmaking.  Yet, we decline to apply retroactivity as an absolute rule at the expense of fundamental fairness.  Justice Campbell readily acknowledges that the United States Supreme Court allows courts wide discretion with regard to retroactive application in most circumstances.  Thus, the primary argument we glean from Justice Campbell's separate opinion is that Tennessee traditionally has followed a stringent approach of retroactive application, and that applying today's holding prospectively would deviate from that perceived precedent.  We disagree with this interpretation of the caselaw, and it is our view that the same cases cited by Justice Campbell actually support our position that our Court has never fully abdicated its discretion to apply holdings either retroactively or prospectively.

First, Justice Campbell cites our Court's ruling in the aforementioned <u>Collier</u> case. 411 S.W.3d 886.  It is Justice Campbell's position that "this Court [in <u>Collier</u>] partially abrogated the exact same accomplice-corroboration rule that is at issue here."  We disagree with that characterization.  The <u>Collier</u> Court sought to abrogate an *exception* to the accomplice corroboration rule, not a part of the rule itself.  <u>Id.</u> at 899 ("[W]e overrule all prior Tennessee decisions recognizing the *exception* that requires corroboration of the testimony of a minor victim of a sex offense despite the fact that the minor could not be charged with the offense." (emphasis added)).  The Court's primary justification for abrogation of that exception was that "a minor victim of a sex offense . . . could not be charged with the offense."  <u>Id.</u>  The <u>Collier</u> Court viewed the exception at issue as

---

[35]  <u>See</u> Tenn. R. App. P. 42(a) ("The clerk of the Supreme Court shall transmit to the clerk of the trial court the mandate of the Supreme Court, with notice to the parties, 11 days after entry of the judgment unless the court orders otherwise.").

inconsistent with the accomplice-corroboration rule altogether because a minor victim of a sex-related crime was not, by definition, an "accomplice."

According to Justice Campbell, "Collier implicated precisely the same fairness and reliance concerns that the majority and separate opinions fixate on today, yet we had no problem applying our holding retroactively in that case. It is hard to see why the case currently before us should be treated any differently." We do not disagree with the Collier Court's decision to apply that holding retroactively. From the date it was first applied, the exception abrogated in that case was inconsistent with the accomplice-corroboration rule. However, abrogating an exception that is on its face inconsistent with a court-made rule is vastly different from abrogating a rule itself, and that distinction should garner consideration as we seek to balance our duty to correct the law while also prioritizing fundamental fairness towards the defendant. Accordingly, we do not conclude that Collier set precedent that deprives us of the discretion to choose whether retroactive or prospective application is the proper approach on a case-by-case basis.

Next, Justice Campbell cites State v. Dorantes, in which our Court retroactively adopted a federal rule requiring that "direct and circumstantial evidence . . . be treated the same when weighing the sufficiency of such evidence." 331 S.W.3d 370, 381 (Tenn. 2011). The Dorantes Court wrote that that case was one of the "rare instances where the application of the federal and state standards could result in a different outcome" and that, in practice, the distinction between the new and old language "rarely made a difference." Id. The Court elaborated that, because "the distinction . . . ha[d] rarely made a difference . . . there ha[d] been little reason to refine [the Court's] standard of review by voicing disapproval of much of the terminology used in [State v.] Crawford, [470 S.W.2d 610 (Tenn. 1971)]." Id.

Abrogation of the accomplice-corroboration rule is a vastly different situation from that of Dorantes. It is not an incremental change that will "rarely ma[ke] a difference." See id., 331 S.W.3d at 381. Rather, we are quite certain that returning this aspect of factfinding and evaluation of witness credibility to its proper place before the jury will result in a number of outcomes going forward that would have been different with an accomplice-corroboration rule in place. Yet, applying our holding retroactively would not grant the jury the role we intend to convey with this decision. In this case, we are not just *refining* a standard of review, we are abrogating a common law rule altogether. In our view, treating these two cases as synonymous is an "apples and oranges" style comparison.

Likewise, we disagree with Justice Campbell's view that State v. Rogers supports retroactive application in this case. 992 S.W.2d 393. In Rogers, the Court wrote that, "[o]ur research indicates that the [year-and-a-day] rule has never served as the ground of decision in any Tennessee case," that "abolition of the rule does not allow the State to obtain a conviction upon less proof," and that, prior to Rogers, "[T]he Court of Criminal Appeals [had] opined that the year-and-a-day rule had been abolished by passage of the

- 23 -

[Criminal Sentencing Reform] Act [of 1989]." Id. at 402. While we no longer see a place for the accomplice-corroboration rule in our state, it cannot be denied that its existence and history has been consequential to Tennessee's criminal law jurisprudence, that abolition of this rule retroactively would allow the State to obtain a conviction upon less proof that could very well lead to a conviction, and that no court of appeal in our state has viewed the accomplice-corroboration rule as abolished by an act of the General Assembly. As a result, in our view, the case before us is quite distinguishable from Rogers.

For the reasons set forth above, we do not agree with Justice Campbell's characterizations of retroactive application as a "longstanding and unbroken practice" and a "traditional rule" in Tennessee. Additionally, we disagree with the proposition that this decision produces a threat to the principle of *stare decisis*.[36] Justice Scalia himself, cited by Justice Campbell to support the idea that our holding "should concern anyone who cares about stare decisis," lambasted the concept of retroactive application of changes to the common law in criminal cases in his dissent in Rogers v. Tennessee.[37]

While bright-line rules often are helpful, and sometimes preferable, we do not hesitate to reject such an approach when we deem it improper. See, e.g., State v. Talley, 307 S.W.3d 723, 730, 734 (Tenn. 2010) (rejecting the defendant's urges for the Court to adopt a bright-line rule and instead maintaining a totality-of-the-circumstances test). We are not prepared to limit this Court's discretion with regard to retroactive and prospective application in criminal cases. Instead, this case provides a prime example of why such discretion is needed.

Like the Supreme Court of Maryland, we conclude that a trial court need only issue a cautionary jury instruction after accomplice testimony is presented. See Jones, 216 A.3d at 919–20 n.9. Until such time as the Committee on Pattern Jury Instructions (criminal) of the Tennessee Judicial Conference adopts a permanent instruction on this issue, the trial

---

[36] Indeed, we respectfully disagree that this Court's exercise of discretion, well-within the confines of existing law in this case, creates any type of legitimate threat to *stare decisis*.

[37] "According to Bouie[, 378 U.S. 347], not just 'unexpected and indefensible' retroactive changes in the common law of crimes are bad, but *all* retroactive changes. . . . It follows from the analysis of Bouie that 'fair warning' of impending change cannot insulate retroactive *judicial* criminalization . . . ." Rogers, 532 U.S. at 470–71 (Scalia, J., dissenting).

> [W]hy not . . . count in petitioner's favor (rather than *against* him) those jurisdictions that have abolished the rule . . . through *prospective* rather than *retroactive* judicial rulings[?] . . . That is to say, even if it was predictable that the rule would be changed, it was *not* predictable that it would be changed *retroactively*, rather than in the *prospective* manner to which legislatures are restricted by the *Ex Post Facto* Clause, or in the *prospective* manner that most other courts have employed.

Id. at 479.

- 24 -

courts of our state should utilize the following temporary jury instruction in cases involving accomplice testimony:

> The prosecution has presented a witness who claims to have been a participant with the defendant in the crime charged. While you may convict upon this testimony alone, you should act upon it with great caution. Give it careful examination in the light of other evidence in the case. You are not to convict upon this testimony alone, unless you are convinced beyond a reasonable doubt that it is true.

This temporary instruction is similar to the instruction used in trial courts in the State of Colorado. Model Criminal Jury Instruction Committee of the Colorado Supreme Court, Colorado Jury Instructions Criminal 2022, Aug. 8, 2019, at 186, https://www.courts.state.co.us/userfiles/file/Court_Probation/Supreme_Court/Committees /Criminal_Jury_Instructions/2022/COLJI-Crim%202022%20-%20Final.pdf.

### ii. Ms. Turner's Murder Convictions

Ms. Turner was convicted of three counts of first-degree premeditated murder under Tennessee Code Annotated section 39-13-202(a)(1). That portion of the statute defines first-degree murder as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2018 & Supp. 2023). "[P]remeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself." Id. § -202(e) (internal quotations omitted). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." Id. Still, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. Additionally, a person may be found "criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2018). One may be found criminally responsible for another's conduct if:

(1)    Acting with the culpability of the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2)    Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3)    Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its

- 25 -

commission, the person fails to make a reasonable effort to prevent commission of the offense.

Id. § -402. The Defendants were prosecuted both under the theory that they were active participants in the murders and the theory that they were "criminally responsible" for the actions of one another.

In order to address whether the evidence is sufficient to support Ms. Turner's murder convictions, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). When making that determination, the prosecution is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." Bland, 958 S.W.2d at 659. Typically, we cannot and will not attempt to re-weigh or re-evaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (citing Bland, 958 S.W.2d at 659). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt." State v. Carruthers, 35 S.W.3d 516, 557–58 (Tenn. 2000) (citing State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). Therefore, on appeal, the defendant is burdened with proving why the evidence is insufficient to support the jury verdict. Id.

In accordance with the holding in the previous subsection of this opinion, to sustain Ms. Turner's murder convictions, the convictions must not be "solely based upon the uncorroborated testimony of one or more accomplices." Supra, sect. (II)(a)(i) (quoting Collier, 411 S.W.3d at 894). For additional evidence to be considered adequately corroborative, there need be "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference . . . that a crime has been committed [and] that the defendant is implicated in it." State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (quoting Bigbee, 885 S.W.2d at 803). Corroborative testimony can be either direct or circumstantial, but "must . . . include some fact establishing the defendant's identity." Id. The testimony itself does not need to be "adequate, in and of itself, to support a conviction." Id. Rather, "it is sufficient to meet the requirements of the rule if [corroborative evidence] fairly and legitimately tends to connect the defendant with the commission of the crime charged." Id. (emphasis removed). Corroboration does not need to "extend to every part of the accomplice's evidence." Id. "In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997), perm. app. denied, (Tenn. Dec. 22, 1997). "Evidence which merely casts a suspicion on the accused or establishes he or she had an opportunity to commit the crime in question is inadequate to corroborate an accomplice's testimony." Id. Additionally, "evidence that the accused

was present at the situs of the crime and had the opportunity to commit the crime is not sufficient." Id.

Because Mr. Hawkins was indicted for the same homicides that are at issue in this case, he clearly meets the definition of an "accomplice." Collier, 411 S.W.3d at 894 (quoting Monts, 379 S.W.2d at 43) (identifying the normal test for qualification as an accomplice as "whether the alleged accomplice could be indicted for the same offense charged against the defendant"). The State argues that Mr. Hawkins' testimony is corroborated by the following evidence:

1. Testimony by Jeremiah that Ms. Turner was a Vicelord who regularly attended gang meetings.
2. Testimony by Jeremiah that Ms. Turner was present at the Duplex hours before the murders.
3. Testimony by Mr. Malone that Ms. Turner's car was parked across the street from the Duplex and Ms. Turner's admission that she owned the car in question.
4. Police discovery of broken glass fragments and marijuana near the part of the street in which Ms. Turner's vehicle had been parked.
5. Evidence of the phone call in which Mr. Thomas called Mr. Leachman and asked him to tell Ms. Turner to "stick to the script," and not to accept an offer of probation because it would be "like a sign of guilt."

Ms. Turner disagrees, arguing that Mr. Hawkins' story "fails to match the eyewitness account of events that transpired just before and just after the shooting." Unlike the majority of the Court of Criminal Appeals, we conclude that the evidence is insufficient to corroborate the testimony of Mr. Hawkins.

First, we conclude that testimony alleging that Ms. Turner is a member of the Vicelords and regularly attended gang meetings does not sufficiently corroborate Mr. Hawkins' testimony regarding her alleged participation in the murders at the Duplex. For evidence to corroborate the testimony of an accomplice, that evidence must relate to the identity of the defendant as a criminal actor. State v. Boxley, 76 S.W.3d 381, 387 (Tenn. Crim. App. 2001), perm. app. denied, (Tenn. Apr. 1, 2002). Evidence of mere membership in a gang cannot prove, in itself, that a person committed a crime. Rather, gang-affiliation in a presumably gang-related crime is more akin to "[e]vidence which merely casts a suspicion on the accused." Griffis, 964 S.W.2d at 589.

Additionally, we do not find that Jeremiah's testimony placing Ms. Turner at the Duplex hours before the murders adequately corroborates Mr. Hawkins' testimony. We note again that "evidence that the accused was present at the situs of the crime" is insufficient to corroborate accomplice testimony. Id. Furthermore, that testimony does not even aid the State's case that Ms. Turner was present at the scene of the crime when it

was committed. Rather, Jeremiah testified that he left the Duplex around nine o'clock at night, several hours before the killings presumably occurred. We do not find that this evidence helps affirm Ms. Turner's participation in the murders, whether through her own acts or through the acts of another for whom she was criminally responsible.

For similar reasons, Mr. Malone's testimony that Ms. Turner's car was parked across the street from the Duplex and Ms. Turner's identification of the car as her own do not sufficiently corroborate Mr. Hawkins' testimony. Notably, Mr. Malone testified that he did not see Ms. Turner on the Duplex porch at the time he saw the car. Further, the weight of the evidence indicates that Ms. Turner shared ownership of the car with Mr. Thomas. Ownership of a car parked near the scene of the crime cannot "confirm . . . that . . . a crime has been committed," especially under circumstances in which the accused is not the sole owner of the vehicle. Id. Rather, it is equally plausible that someone else used the car to drive to and from the crime scene without Ms. Turner's knowledge. Accordingly, this evidence falls well short of placing her at the Duplex at the time of the murders altogether and, likewise, fails to confirm that Ms. Turner participated in the murders or is criminally responsible for the conduct of the other defendants.

Next, we address the broken glass and marijuana discovered by police near the part of the street in which the maroon-colored car had been parked. We conclude that this evidence is also insufficient to corroborate Mr. Hawkins' testimony. We decline to hold that police recovering broken glass and marijuana near the part of the street where the car was parked "fairly and legitimately tends to connect the defendant with the commission of the crime charged." Bane, 57 S.W.3d at 419 (quoting Bigbee, 885 S.W.2d at 803) (emphasis removed). As previously explained, for additional evidence to be considered adequately corroborated, there need be "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference . . . that a crime has been committed [and] that the defendant is implicated in it." Id. Corroborative testimony can be either direct or circumstantial, but must "include some fact establishing the defendant's identity." Id. Here, the evidence of the broken glass and marijuana does not create any inference that Ms. Turner committed or was criminally responsible for the murders. For example, the record does not indicate that her fingerprints were found on the glass or contain any other indication that the glass and marijuana are linked to Ms. Turner. In other words, when viewing this evidence "entirely independent of the accomplice's testimony," id. (quoting Bigbee, 885 S.W.2d at 803), it does not establish Ms. Turner's identity in any way. Indeed, based on the record, it is equally conceivable that Mr. Hawkins dropped the marijuana himself. As a result, this evidence also falls short of providing adequate corroboration.

We are further unpersuaded by the State's argument that Mr. Thomas' phone call to Mr. Leachman, which included suggestions by Mr. Thomas that Ms. Turner "stick to the script" and avoid taking a probation offer because it would be "like a sign of guilt," corroborates Mr. Hawkins' testimony that Ms. Turner participated in the homicides. As

Judge McMullen pointed out in her dissent, "accomplices may not corroborate each other." Thomas, 2021 WL 5015255, at *34 (McMullen, J., dissenting); see also Boxley, 76 S.W.3d at 386 (citing State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)). The State argues that, because other states allow accomplices to corroborate each other, we should as well. Given that we are abolishing the accomplice-corroboration rule going forward, it would make little sense for us to change our State's policy on permitting accomplices to corroborate one another for the circumstances of this one case. Additionally, from a practical perspective, we do not consider Mr. Thomas' efforts to cover for himself as evidence that Ms. Turner has committed a crime.

We agree with Judge McMullen that the evidence the State cites as corroborative of Mr. Hawkins' testimony falls short of confirming that Ms. Turner committed the crimes she has been convicted of, whether "through her own acts or through the acts of another for whom she was criminally responsible." Thomas, 2021 WL 5015255, at *34 (McMullen, J., dissenting). Accordingly, we reverse all three of Ms. Turner's convictions and dismiss the charges against her. For these reasons, we conclude our analysis with regard to Ms. Turner here and find that we need reach the Brady issue for Mr. Thomas only.

### B. Alleged Brady Violation–The State's Failure to Disclose All of Mr. Hawkins' Proffer Session Statements

First, we will briefly discuss the origins and history of the Brady disclosure rule. After that, we will address whether, based on the rule itself and the record before us, Mr. Thomas' rights were violated because of the State's failure to disclose, prior to trial, all inconsistent statements made by Mr. Hawkins at proffer sessions.

### i. The Brady Disclosure Rule

The Brady disclosure rule stems from the landmark United States Supreme Court case, Brady v. Maryland. 373 U.S. 83. In that case, the defendant's counsel asked the prosecution to let him examine a criminal companion's extrajudicial statements before trial. Id. at 84. Although most such extrajudicial statements were provided, one statement in which the defendant's criminal companion admitted to committing the homicide at issue was withheld by the prosecution. Id. The defendant was not made aware of that extrajudicial statement until after he had already been tried and convicted and had his conviction affirmed. Id. The defendant sought a new trial based on the evidence suppressed by the prosecution, but his appeal from a denial of that motion was dismissed by the Supreme Court of Maryland under the Maryland Post Conviction Procedure Act. Id. at 84–85 (citing Brady v. State, 160 A.2d 912 (Md. 1960)). After the trial court dismissed the defendant's petition for post-conviction relief, the Supreme Court of Maryland held that suppression of the evidence by the prosecution denied the defendant

due process of the law and remanded the case for a retrial on the question of punishment, but not the question of guilt.  Id. at 85 (citing Brady v. State, 174 A.2d 167 (Md. 1961)).

The Supreme Court of the United States subsequently granted certiorari to answer the question of "whether [the defendant] was denied a federal right when the [Supreme Court of Maryland] restricted the new trial to the question of punishment."  Id.  The Court held that suppression of the confession violated the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.  Id. at 86.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request," said the Court, "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  In subsequent cases the Supreme Court held that, in addition to exculpatory evidence, impeachment evidence falls within the confines of Brady.  United States v. Bagley, 473 U.S. 667, 676 (1985); see also Giglio v. United States, 405 U.S. 150, 154–55 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [a witness'] credibility and the jury [is] entitled to know of it.").  The purpose of the Brady rule "is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."  Bagley, 473 U.S. at 675.

## ii. *Brady as Applied to Mr. Thomas*

To show that a Brady violation has occurred a defendant need demonstrate that: "(1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material."  Waterford v. Washburn, 455 F. Supp. 3d 579, 608 (M.D. Tenn. 2020) (citing State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014)).  Mr. Thomas argues that he requested information regarding Mr. Hawkins' contradictive statements and statements including new facts or details, the State failed to disclose such statements to Mr. Thomas' counsel before trial, the information would have been favorable to Mr. Thomas, and the information was material.  The dispute in this case primarily revolves around whether the proffer statements were "material."

We review the lower court's "findings of fact, such as whether the defendant requested the information or whether the state withheld the information . . . *de novo* with a presumption that the findings are correct unless the evidence preponderates otherwise."  Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).  "[C]onclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely *de novo* standard with no presumption of correctness."  Id.  Mr. Thomas is required to "prov[e] a constitutional violation by a preponderance of the evidence."  State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).  To "prov[e] a constitutional violation is to show that the omission [of the proffer statements] is of such significance as to deny the defendant the right to a fair trial."  Id. (citing United States v. Agurs, 427 U.S. 97, 108 (1976)).

We find no reason to call into question whether Mr. Thomas requested the information at issue. Mr. Thomas' motion for pretrial disclosure clearly requested the information and that request was reiterated by counsel for Mr. Thomas at the hearing on the motion. And, although the motion was ultimately denied, the trial judge ordered that if Mr. Hawkins was to be "asked something in . . . proffer sessions that the answer to that should have included the original detail and did not give it and then later upon further . . . review shared this that they—that common sense would say they should have," such statements needed to be provided to counsel for the Defendants.

With regard to the failure to disclose portion of the analysis, instead of disputing Mr. Thomas' claims that it failed to disclose the statements made in proffer sessions before trial, the State admits that it did not disclose the statements before trial, but argues in its brief that "this is a case of *delayed* disclosure." "Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." United States v. Bencs, 28 F.3d 555, 560–61 (6th Cir. 1994) (citing United States v. Ward, 806 F.2d 658, 665 (6th Cir. 1986)). "Delay only violates Brady when the delay itself causes prejudice." Id. (quoting United States v. Patrick, 965 F.2d 1390, 1400 (6th Cir. 1992)). Deciding in this case whether delayed disclosure causes prejudice is closely related to the question of whether the information is material. As such, our materiality analysis will address the effect of the delayed disclosure.

We next consider whether the suppressed evidence was "favorable" to Mr. Thomas. According to our Court, "[e]vidence is favorable under Brady if it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks." Nunley v. State, 552 S.W.3d 800, 818 (Tenn. 2018) (quoting Jordan v. State, 343 S.W.3d 84, 96 (Tenn. Crim. App. 2011)). Mr. Thomas argues in his brief that the favorability element of Brady is satisfied because he was denied "valuable impeachment material against the State's main witness" and "absolved . . . of direct responsibility for the shooting of Ms. Springfield." Additionally, Mr. Thomas contends that "[h]ad counsel for Mr. Thomas known that [Mr.] Hawkins would testify that [Ms. Turner] shot [Ms. Springfield], they would not have advised Mr. Thomas to waive any objection to an apparent conflict of interest with Ms. Turner, but would have been free to explore the possibility of cooperation with the State." Mr. Thomas also asserts that he "would not have waived the right to DNA testing on some hairs found in the back room in [Mr.] Glover's hands" and "might have changed trial strategy by challenging the notion that Mr. Thomas was criminally responsible for the actions of Ms. Turner and Mr. Hawkins." The State counters by arguing that the evidence is "merely cumulative of the impeachment evidence drawn out before the jury trial when [Mr.] Thomas's counsel pointed out that [Mr.] Hawkins had told a different story in his written statement to police," and that evidence that Mr. Hawkins had provided consistent stories during proffer sessions "would likely have bolstered his credibility."

We agree with Mr. Thomas on this portion of the analysis. The fact that the evidence may have been "cumulative" does not override its favorability towards Mr. Thomas, because evidence still may be considered "favorable" in the Brady context under these circumstances. See Nunley, 552 S.W.3d at 818 ("[S]o long as the evidence qualifies as favorable to the accused, the Brady duty of disclosure applies, irrespective of the admissibility of the evidence at trial.") (alteration in original) (quoting Jackson, 444 S.W.3d at 593–94 (Tenn. 2014)). The undisclosed statements made in proffer sessions "provide[] grounds for the defense . . . to impeach the credibility" of Mr. Hawkins, and accordingly fall within the impeachment category of favorable evidence. See id. (quoting Jordan, 343 S.W.3d at 96).

We now turn to the crux of our analysis on this issue, the "materiality" element. Although the Brady decision itself does not define the standard for materiality, the Supreme Court of the United States has sought to define what types of evidence are "material . . . to guilt or to punishment" in subsequent decisions. The standard has changed over time, but the current requirement for undisclosed evidence to be considered "material" is that the nondisclosure of evidence must be "so serious" that it creates "a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281 (1999).

Although Mr. Thomas' brief provides several arguments regarding how his trial strategy may have differed had his trial court counsel been made aware of the proffer session statements earlier, it does not provide much of an argument regarding why he believes there is a "reasonable probability" that the outcome would have been different in this case had the proffer statements been disclosed earlier.[38] Meanwhile, the State argues that Mr. Thomas "has [not] made a compelling case that [he was] prejudiced by the delay." The State reiterates its position that this case is one of delayed disclosure, rather than an outright failure to disclose, and notes that Mr. Thomas thus "faces a higher hurdle" in proving a Brady violation occurred. United States v. Todd, 825 F. App'x 313, 319 (6th Cir. 2020) (citing Joseph v. Coyle, 469 F.3d 441, 472 (6th Cir. 2006)).

We agree with the State's argument that the case before us is one of "delayed disclosure." When there is a delayed disclosure of evidence, we must decide whether that delay prevented defense counsel from "using the disclosed material effectively in preparing and presenting the defendant's case." State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting) (citing United States v. Ingraldi, 793 F.2d 408 (1st Cir. 1986)). Only when a delayed disclosure "prevents material exculpatory evidence from effectively being used at trial is there a due process violation." Id.

---

[38] Instead, Mr. Thomas' brief pivots to an attack on Mr. Hawkins' credibility and attempts to re-litigate issues decided by the Court of Criminal Appeals which we specifically declined to grant review of in our order granting the Rule 11 Application on a limited basis.

Counsel for Mr. Thomas admitted at oral argument that Mr. Thomas was charged under the "criminal responsibility" theory. That admission severely undercuts Mr. Thomas' contention that earlier access to the statements alleging that Ms. Turner, rather than Mr. Thomas, shot Ms. Springfield would generate the "reasonable probability" of a different outcome at trial. Based on the charges, which defendant pulled the trigger as to which victim is inconsequential. Instead, mere participation in a concerted effort to commit the murders was sufficient for the jury to find Mr. Thomas guilty of the charges. We also do not find that Mr. Thomas was deprived of the opportunity to make effective use of this information at trial based on the delayed disclosure. Rather, Mr. Thomas had access to the evidence prior to cross-examination at trial, providing Mr. Thomas' counsel with ample opportunities to impeach Mr. Hawkins' credibility. While it would have been preferable for the State to provide Mr. Thomas' counsel with this information earlier, we are unpersuaded that a lack of earlier access undermines the confidence of the jury verdict.

Other arguments put forward by Mr. Thomas in favor of materiality are that he "would not have waived the right to DNA testing on some hairs found in the back room in [Mr.] Glover's hands," might have changed trial strategy, and might not have waived an objection to an apparent conflict of interest with Ms. Turner. Mr. Thomas claims that he was denied "valuable impeachment material against the primary prosecution witness [a]nd denied . . . possible avenues of investigation and possible defenses." We find each of these arguments unpersuasive and, in many instances, merely speculative.

With regard to the DNA testing of hairs, Mr. Thomas was in no way forced to waive the right to DNA testing because of the delayed disclosure. Rather, he voluntarily chose to do so. Had the statements made in proffer sessions been disclosed earlier, he would have had that same choice. Speculation that he would have done differently is insufficient in a delayed disclosure case, because the lack of access to statements made in proffer sessions did not in any way impact his ability to request DNA testing. Accordingly, we agree with the State that Mr. Thomas' "speculation about these hairs does not undermine the confidence in the verdict."

For similar reasons, we disagree with Mr. Thomas' contentions that a hypothetical change in trial strategy and a hypothetical change to a waiver of an apparent conflict of interest undermines our confidence in the verdict. As we specified earlier, the burden is on Mr. Thomas to show that there is a "reasonable probability" that a different trial strategy or waiver of conflict of interest would lead to a different outcome in the trial court. See Strickler, 527 U.S. at 281. Yet, Mr. Thomas fails to offer a more detailed argument than the vaguely worded contention in his brief that he was "denied . . . possible avenues of investigation and possible defenses." No attempt is made to articulate just what avenues of investigation or defenses these would be. We simply cannot conclude that Mr. Thomas meets his burden of proof on the "materiality" element given that the gist of his argument

is that, had his counsel had access to the statements made by Mr. Hawkins at proffer sessions earlier, he likely would have done some things differently.

Accordingly, we find no violation of <u>Brady</u>.  Thus, we affirm the judgment of the Court of Criminal Appeals on this issue.  Mr. Thomas' convictions are upheld.

### III. CONCLUSION

With regard to Ms. Turner's murder convictions, for the reasons stated earlier in this opinion, we hold that the evidence is insufficient to support her convictions.  Accordingly, we reverse the Court of Criminal Appeals and dismiss these charges against Ms. Turner.  Because Ms. Turner's convictions are overturned on other grounds, we declined to reach the <u>Brady</u> issue with regard to Ms. Turner.  Costs of Ms. Turner's appeal are assessed against the State.

As to Mr. Thomas' murder convictions, for the reasons set forth earlier in this opinion, we conclude that he has not satisfied his burden of proving a violation of the <u>Brady</u> rule on the part of the State.  On this issue we affirm the decision of the Court of Criminal Appeals.  As a result, we affirm Mr. Thomas' convictions.  Because Mr. Thomas appears to be indigent, the costs of his appeal are taxed to the State.

Additionally, for the reasons articulated in Section II(A)(i) of this opinion, we prospectively abrogate Tennessee's common law accomplice-corroboration rule. Commencing with the date of the mandate, this shall be applied to all trials going forward.

_____
JEFFREY S. BIVINS, JUSTICE